890 A.2d 922

AQUA BEACH CONDOMINIUM ASSOCIATION, A NOT-FOR-PROF-
IT CORPORATION OF THE STATE OF NEW JERSEY, PETI-
TIONER–APPELLANT, v. DEPARTMENT OF COMMUNITY AF-
FAIRS, BUREAU OF HOMEOWNER PROTECTION, NEW
HOME WARRANTY PROGRAM, RESPONDENT–RESPONDENT.

Argued September 28, 2005—Decided January 18, 2006.

*Norman W. Briggs,* argued the cause for appellant (*Frey Petrakis Deeb Blum Briggs & Mitts,* attorneys; *Mr. Briggs* and *Michele L. Weckerly,* on the brief).

*Patricia E. Stern,* Deputy Attorney General, argued the cause for respondent (*Peter C. Harvey,* Attorney General of New Jersey, attorney; *Patrick DeAlmeida,* Assistant Attorney General, of counsel).

JUSTICE RIVERA–SOTO delivered the opinion of the Court.

This appeal requires that we address two related issues that arise out of the operation of the New Home Warranty Program administered by the Bureau of Homeowner Protection (Bureau) of the Department of Community Affairs (DCA). First, we must address whether, under the circumstances presented, the Bureau's processing and ultimate denial of certain home warranty claims was arbitrary, capricious or unreasonable and, second, whether there is legally competent evidence in this record to support the claimant's assertion that it had received oral authorization from a representative of the Bureau to proceed with the repairs and,

hence, the Bureau is equitably estopped from asserting a failure to comply with the repair pre-authorization requirements of the governing regulations.[1]

We hold that the Bureau's regulations requiring that a claimant under the Home Warranty Program submit to the Bureau "two or more bona fide estimates acceptable to the Division [of Codes and Standards of the DCA] for the work intended to be covered," *N.J.A.C.* 5:25–5.5(e)2, as a condition precedent to certification by the Director of the Division to the State Treasurer for payment from the Home Warranty Security Fund (Fund), *N.J.A.C.* 5:25–5.5(e)1, for "work authorized in writing by the [DCA] and upon completion to the [DCA's] satisfaction," *N.J.A.C.* 5:25–5.5(e)2, are neither arbitrary, nor capricious, nor unreasonable, either as written or as applied in this instance. We further hold that, under the circumstances presented here, there was no legally competent evidence on which to base any equitable estoppel claim against the Bureau.

## I.

Petitioner Aqua Beach Condominium Association (Aqua Beach) is a New Jersey not-for-profit corporation organized as the condominium association in respect of a complex of three structures (Buildings A, B, and C) located in North Wildwood, New Jersey and constructed in 1989. At that time, Aqua Beach applied for and was certified as eligible to participate in the Fund. Authorized by *N.J.S.A.* 46:3B–7a, the Fund was established by the State to "protect[ ] the consumer from the builder who . . . 'is unable to or willfully refuses to correct . . . deficiencies. [In that event] an amount sufficient to cure the problem [is] paid from the fund to the [home]owner.' " *Fisch v. Bureau of Constr. Code Enforce-*

---

[1] Aqua Beach couches its claim in the positive: that the proofs below support the finding that DCA in fact authorized the repairs. We address Aqua Beach's claim more correctly as an assertion that DCA is equitably estopped from denying Aqua Beach's claim for warranty work under the Home Warranty Security Fund. *See infra,* 186 *N.J.* 18–19, 890 *A.*2d 931 (2005).

*ment,* 238 *N.J.Super.* 410, 412–13, 570 *A.*2d 2 (App.Div.1990) (citation and footnote omitted). However, as a result of the intervening bankruptcy of Aqua Beach's original developer, only eleven of twenty-four eligible condominium units actually enrolled for participation in the Fund; these were one of eight units in Building A, four of eight units in Building B, and six of eight units in Building C.

In 1998, Aqua Beach noted certain structural defects in construction in the common elements of each of the three buildings constituting the condominium complex. By a letter dated March 18, 1998, the Bureau was advised by Aqua Beach that it was submitting those claims to the Fund for processing. After an exchange of correspondence, on September 15, 1998, the Bureau inspected the condominium complex, cautioning Aqua Beach that, because only eleven of twenty-four units participated in the Fund, the Bureau would limit its inspection to the common elements related to the covered units. As a result of the inspection, the Bureau advised that it would cover repairs to major structural defects, but only in proportion to the number of units covered by the Fund in their respective buildings. The separate inspection reports for each of the buildings, which were forwarded to Aqua Beach in late October and early November of 1998, revealed no covered major structural defects in respect of Building A. However, because the inspection reports disclosed major structural defects in Buildings B and C, the Bureau notified Aqua Beach that the Fund would cover fifty percent of the costs of repairs for major structural defects in Building B (where four of eight units, or fifty percent, participated in the Fund), and seventy-five percent of the costs of repairs for major structural defects in Building C (where six of eight units, or seventy-five percent, participated in the Fund). In the inspection reports for Buildings B and C, and in order to implement its findings, the Bureau advised Aqua Beach in writing that Aqua Beach was required to submit "two or more bona fide estimates acceptable to the Division for work intended to be covered." *N.J.A.C.* 5:25–5.5(e)2. Aqua Beach never contested the contents of the inspection reports. Instead, Aqua Beach

acknowledged its obligation to submit, and ultimately requested and received additional time to submit, the required minimum two estimates of repair work sought to be covered by the Fund. Despite that additional time, Aqua Beach nevertheless failed to complete that process, even after a July 12, 1999 written warning from the Bureau that a failure to complete it by August 11, 1999 would result in the administrative denial of Aqua Beach's claims.[2] Based on Aqua Beach's failure to complete the claim submission process by the deadline set forth, the Bureau closed its file.

Aqua Beach's response was two-fold. First, through its counsel, Aqua Beach sought to contest the Bureau's administrative denial of the claims, and, ultimately, Aqua Beach requested a hearing on the denial of the claims. *See generally N.J.A.C.* 5:25–5.5. That matter then was referred to the Office of Administrative Law (OAL). Second, without notice to the Bureau, without submitting to the Bureau the required minimum of two bids for the repair work, and without allowing the Bureau the opportunity to approve the same, Aqua Beach unilaterally hired a contractor and, at some time during the first half of 2001, completed the repair work.

_____

[2] The Bureau's separate inspection reports for each of Buildings B and C requested that Aqua Beach use the "[e]nclosed copies of the Work List ... to obtain a minimum of two bids from independent contractors[, that w]hen the bids are obtained, they are to be forwarded to this office for review[, and that u]pon approval you will be authorized to have the work done." Aqua Beach did submit three bids, but only for the engineering design and specifications part of the repair work to be performed and the Bureau did approve the lowest of these bids, totaling $4,480. In the written transmittals to Aqua Beach approving those engineering design and specifications costs, the Bureau instructed Aqua Beach to sign and return confirmatory invoices. To date, Aqua Beach has failed to do so, a failure that ultimately precipitated the closing of Aqua Beach's file with the Bureau and one that is not directly challenged in this appeal. However, if Aqua Beach signs and returns the confirmatory invoices as earlier instructed by the Bureau, including Aqua Beach's "presentation of proof that the contractor has been paid," *N.J.A.C.* 5:25–5(e)2, we see no reason, even at this belated date, for the Bureau to decline to honor its earlier commitment to pay those sums to Aqua Beach out of the Fund. That obligation may be juxtaposed against the statutory mandate that "[r]easonable hearing fees shall be assessed against the unsuccessful party." *N.J.S.A.* 46:3B–7c.

It was not until August 16, 2001 that Aqua Beach notified the Bureau that the repair work had been completed. On October 5, 2001, the Bureau moved before the assigned Administrative Law Judge to dismiss Aqua Beach's claims. In reply, Aqua Beach's counsel asserted that, during a February 6, 2001 telephone conversation between counsel and the Bureau's supervising project engineer, the Bureau's engineer orally authorized the repair work. The Administrative Law Judge instructed the parties to brief that issue. The evidence propounded consisted of the certification of Aqua Beach's counsel, the certification of the Deputy Attorney General (DAG) assigned to handle Aqua Beach's contested case before the OAL, and the testimony of the Bureau's engineer.

In a nutshell, Aqua Beach's counsel certified that he spoke with the DAG on February 5, 2001 to discuss whether Aqua Beach could proceed with the repairs despite the acknowledged fact that Aqua Beach had not submitted, and the Bureau hence had not approved, the required minimum two bids. Aqua Beach's counsel certified that he told the DAG that Aqua Beach wished to proceed with its repairs but did not want to jeopardize its pending claims against the Fund. The DAG certified that he had advised Aqua Beach's counsel that, if Aqua Beach proceeded with the repairs without prior Bureau approval, the costs of the repair would not be covered by the Fund and the claims would be waived. According to the DAG's certification, Aqua Beach's counsel explained that Aqua Beach considered the repairs to be "emergency repairs" and requested permission to speak with a Bureau representative. The DAG acceded to that last request and arranged for a Bureau representative to call counsel.

According to both the certification of counsel and the testimony of the Bureau's engineer, the next day, February 6, 2001, the Bureau's engineer called counsel and again recommended that Aqua Beach obtain the required minimum two bids for the repair work. Tellingly, the certification of Aqua Beach's counsel does not assert that the Bureau ever expressly authorized Aqua Beach to proceed with the repair work or that Aqua Beach's counsel ever

confirmed with the DAG that any such approval was granted. Although Aqua Beach ultimately did obtain bids, it did not submit them to the Bureau until November 5, 2001, almost three months after first advising the Bureau that the repair work had been completed, at least five months after the repair work in fact had been completed, and nine months after, according to Aqua Beach's counsel, the Bureau purportedly authorized Aqua Beach to proceed with the repair work. In his testimony, the Bureau's engineer could not specifically recall his February 6, 2001 telephone conversation with Aqua Beach's counsel. The Bureau's engineer explained that, although it was not uncommon to receive inquiries from anxious homeowners desiring to start repairs immediately, his practice invariably was to cite to the regulations and warn the homeowner that no reimbursement would be made for repairs performed prior to the Bureau's written authorization therefor, a requirement he viewed as "sacrosanct" and one from which he had never deviated in his eleven years as the Bureau's engineer.

By an initial decision dated July 22, 2002, the Administrative Law Judge granted the Bureau's motion to dismiss Aqua Beach's claims. *Aqua Beach Condo. Ass'n v. Bureau of Homeowner Prot.*, 2002 *WL* 1752177, 2002 *N.J. Agen Lexis* 463. In respect of Aqua Beach's obligation to secure the Bureau's prior approval of "the lowest of two or more bona fide estimates acceptable to the Division for the work intended to be covered," *N.J.A.C.* 5:25–5.5(e)2, the Administrative Law Judge held that, because Aqua Beach failed to submit the required minimum two bids as a precondition to payment from the Fund, "Aqua Beach, by proceeding its repair work without the written authorization of [the Bureau] precluded relief under the New Home Warranty Protection Program." *Id.* at *5, 2002 *N.J. Agen Lexis* 463 at **13–14. The Administrative Law Judge also held that Aqua Beach's claims could not be salvaged based on its assertion that those repairs had to be made on an emergency basis. *Id.* at *5, 2002 *N.J. Agen Lexis* at **14–15. Noting that the Bureau's regulations specifically provide for emergent applications, *N.J.A.C.* 1:1–12.6, and that Aqua Beach had not availed itself of that process, the Administra-

tive Law Judge concluded that, under *N.J.A.C.* 5:25–3.4(a)4v, Aqua Beach's failure to take timely action excluded its claims from coverage under the Fund. *Id.* at *5, 2002 *N.J. Agen Lexis at* *14. The Administrative Law Judge held that

> [p]etitioners cannot omit these explicit procedures [submitting 2 or more bona fide estimates, obtaining written authorization to make the repairs, and upon the work being completed to the satisfaction of the Department, having the award certified to the State Treasurer for payment from the Fund] and expect reimbursement for repairs they alone authorized and upon their own agreed-upon price. For these reasons, the merits of petitioners' claim cannot be reached.
>
> [*Id.* at *6, 2002 *N.J. Agen Lexis* at *15, 570 A.2d 2 (citing *Elliott v. Cmty. Affairs Dep't*, 95 *N.J.A.R.*2d (CAF) 81 (1995)).]

Because of that conclusion, the Administrative Law Judge did not reach the second issue raised by Aqua Beach: that it had been authorized to proceed with the repair work during the February 6, 2001 telephone conversation with the Bureau's engineer. On September 30, 2002, the Commissioner of DCA modified the Administrative Law Judge's initial decision in two corrective but minor respects, and adopted the same as the Commissioner's final decision.

On November 15, 2002, Aqua Beach appealed the Commissioner's final decision to the Appellate Division. *R.* 2:2–3(a)(2). While that appeal was pending, the Bureau moved for a limited remand to the OAL for the sole purpose of determining whether, on the existing record and as alleged by Aqua Beach, the Bureau's engineer authorized the repair work during his February 6, 2001 telephone conversation with Aqua Beach's counsel. In a November 14, 2003 initial decision on temporary remand, the Administrative Law Judge held that

> Aqua Beach's failure to submit [the] two bids required by *N.J.A.C.* 5:25–5.5(e)1 and 2 obviated further consideration of the contents of the telephone conversation between [the] attorney for Aqua Beach, and [the] Supervising Project Engineer with the Department of Community Affairs. I have now reviewed the hearing transcripts, in particular the hearing on August 27, 2001, and [the] undated Certification [of Aqua Beach's counsel] filed after August 27.
>
> The only factual finding I can make relative to the remand is that I cannot make a finding of fact based upon the hearing record. Re-reading [the Bureau engineer's] testimony of his recollection of his telephone conference with [Aqua Beach's counsel] is not useful. [The Bureau engineer] recalled [his supervisor] telling [the

Bureau engineer] to call [Aqua Beach's counsel], "that's just very clear to my mind." (T. Feb. 6, 2002, p. 75, 1.5). Thereafter, [the Bureau engineer's] memory faded to a total lack of recall. Beyond telling the other person to the conversation to send in whatever he wished, [the Bureau engineer] could not provide further detail. [The] Certification [of Aqua Beach's counsel] specifies the message he received from [the Bureau engineer]: Aqua Beach was to "obtain a minimum of two bids for the work," the bids were to "delineate what work was being done that addressed repair of the major structural defects," and the bids were to include "the quantity of the materials." *[Aqua Beach's counsel] did not certify he had received any verbal authorization to proceed.*

The omission from the Certification of the words of authorization is not material to my inability to make factual findings regarding the contents of the telephone conversation. The problem in this matter is the lack of some legally competent evidence in the hearing record to support a finding that [the Bureau engineer] verbally authorized Aqua Beach, through its lawyer, to proceed with emergency repairs to the condominium structure. *N.J.A.C.* 1:1–15.5(a) allows the administrative law judge the discretion to admit hearsay evidence into the hearing record. However, *N.J.A.C.* 1:1–15.5(b), the residuum rule, requires "some legally competent evidence" to exist "to an extent sufficient to provide assurances of reliability and to avoid the fact or appearance of arbitrariness."

. . . .

The burden of proof of all the material elements necessary for relief under the New Jersey Home Warranty and Builder's Registration Act rests upon the warranty claimant. That burden must be established by the preponderance of the legally competent, credible evidence in the hearing record. I **CONCLUDE** petitioner did not meet that burden to demonstrate authorization from the respondent to proceed with emergency repairs of the major structural defects in the condominium property threatening the health, safety, or welfare of the persons using the condominium property.

[*Aqua Beach Condo. Ass'n. v. Bureau of Homeowner Prot.,* 2003 *WL* 22907886, at \*\*1–2, 2003 *N.J. Agen Lexis* 761, at \*\*2–4 (emphasis supplied).]

In an unpublished decision, the Appellate Division affirmed the Commissioner's final decision barring Aqua Beach's claims. The panel noted that "Aqua Beach conceded that it did not submit the bids prior to effectuating the repairs or prior to the hearing on August 27, 2001." Relying on *Fisch v. Bureau of Constr. Code Enforcement,* 238 *N.J.Super.* 410, 570 *A.*2d 2 (App.Div.1990), the Appellate Division reaffirmed that a homeowner's *informed* decision to contract for repairs without the Bureau's pre-authorization voided any obligation on the part of the Fund to reimburse the homeowner for those repairs. The panel distinguished *Lakhani v. Bureau of Homeowner's Prot.,* 356 *N.J.Super.* 132, 811 *A.*2d 918

(App.Div.2002), by noting that, in *Lakhani*, the actions of the Commissioner in denying the homeowners' claim were arbitrary and unreasonable, circumstances that were absent here. Applying both *Fisch* and *Lakhani* to this case, the Appellate Division concluded that "the record does not support Aqua Beach's contention that the Bureau prevented Aqua Beach from obtaining authorization by arbitrary handling of the claim or otherwise acting unreasonably." The panel also noted that

> Aqua Beach never sought emergent relief pursuant to *N.J.A.C.* 1:1–12.6, even though an ALJ was assigned and Aqua Beach was aware that the issues were to be bifurcated, with the issue of the extent of the common element warranty to be heard first by way of cross motions for partial summary judgment in October 2000, followed by hearings on the costs of those repairs that qualified as major structural defects. More importantly, as of April 5, 2001, when the ALJ rendered his opinion on the cross motions, Aqua Beach was admittedly aware of its need to make emergent repairs, but nevertheless failed to notify either the Bureau or the ALJ or seek emergent relief to effectuate the repairs pursuant to the regulations. Instead, Aqua Beach remained silent, effectuated the repairs, and did not advise the Bureau that the repairs had been made until it informed the DAG just prior to the initial August 2001 hearing that was scheduled to determine the repairs necessary to cure major structural defects and the associated costs.

The Appellate Division also rejected as "meritless Aqua Beach's assertion that the record established that it obtained authorization to proceed with repairs." The panel concluded that "it is neither unfair nor inequitable to deny Aqua Beach's claim on the basis that it effectuated unauthorized repairs" and that "there was sufficient credible evidence in the record to support the agency's conclusions and the Commissioner's final decision was not arbitrary, capricious, unreasonable, or violative of any legislative policy, either expressed or implied in the Home Warranty Act."

We granted certification, 183 *N.J.* 256, 872 *A.*2d 798 (2005), and, for the reasons that follow, we affirm the judgment of the Appellate Division.

## II.

### A.

When considering the actions of administrative agencies, our scope of review is narrow. "[O]rdinarily, we will not upset a

determination by [an administrative agency] in the absence of a showing that it was arbitrary, capricious or unreasonable, or that it lacked fair support in the evidence, or that it violated legislative policies expressed or implicit in the [enabling legislation]." *Campbell v. Dep't of Civil Serv.*, 39 *N.J.* 556, 562, 189 *A.2d* 712 (1963). More recently, we explained that

> courts have but a limited role to play in reviewing the actions of other branches of government. In reviewing agency action, the fundamental consideration is that a court may not substitute its judgment for the expertise of an agency "so long as that action is statutorily authorized and not otherwise defective because arbitrary or unreasonable."
>
> [*Williams v. Dep't of Human Servs.*, 116 *N.J.* 102, 107, 561 *A.2d* 244 (1989) (citing *Dougherty v. Dep't of Human Servs.*, 91 *N.J.* 1, 12, 449 *A.2d* 1235 (1982)).]

As *Williams, supra*, makes clear:

> [T]he judicial role is restricted to three inquiries: (1) whether the agency's action violated the enabling act's express or implied legislative policies, (2) whether there was insubstantial evidence in the record to support the findings on which the agency based its actions, and (3) whether in applying the legislative policies to the facts, the agency clearly erred by reaching a conclusion that could not reasonably have been made after weighing the relative factors.
>
> [*Id.* at 108, 561 *A.2d* 244.]

Thus, we grant administrative agency action a "strong presumption of reasonableness." *Newark v. Natural Res. Council*, 82 *N.J.* 530, 539, 414 *A.2d* 1304 (1980). In the review of administrative agency action,

> [a]ppellate courts must defer to an agency's expertise and superior knowledge of a particular field. Thus, if substantial credible evidence supports an agency's conclusion, a court may not substitute its own judgment for the agency's even though the court might have reached a different result. Agencies, however, have no superior ability to resolve purely legal questions, and that a court is not bound by an agency's determination of a legal issue is well established.
>
> [*Greenwood v. State Police Training Ctr.*, 127 *N.J.* 500, 513, 606 *A.2d* 336 (1992) (citations omitted).]

It is through this prism that the Commissioner's denial of Aqua Beach's claim for reimbursement from the Fund must be gauged.

### B.

In 1978, the Legislature adopted The New Home Warranty and Builders' Registration Act, *N.J.S.A.* 46:3B-1 to -20 (Act). Section

7a of the Act "establishe[s] a new home warranty security fund to be maintained by the State Treasurer in a trust account, separate and apart from other funds and administered by the commissioner [of DCA]." *N.J.S.A.* 46:3B–7a. As the statute clearly notes,

[t]he purpose of the fund is (1) to provide moneys sufficient to pay claims by owners against builders participating in the fund for defects in new homes covered by the new home warranty; and (2) to pay the costs of administering the new home warranty program established in the [DCA], including the costs of obtaining sufficient reinsurance to prudently protect the fund against unanticipated risks and costs incurred by the board in the discharge of its duties.

[*Ibid.*]

The *res* of the Fund is provided by payments from the builders of new homes, and, in the event the builder fails to make repairs "within a reasonable time or are not satisfactory to the owner," *N.J.S.A.* 46:3B–7c, participating homeowners are permitted to make claims against the Fund for defects caused by (1) "faulty workmanship and defective materials due to noncompliance with the building standards," (2) "faulty installation of plumbing, electrical, [and] heating and cooling delivery systems," or "major construction defects." *N.J.S.A.* 46:3B–3b(1), (2) and (3). Section 3a of the Act specifically "authorize[s] and direct[s] [the Commissioner of DCA] to prescribe by rule or regulation ... procedures for the implementation and processing of claims against the new home security fund as provided for in section 7a. of this act." *N.J.S.A.* 46:3B–3a.

In compliance with that statutory mandate, the Commissioner of DCA has adopted a series of regulations concerning "the implementation and processing of claims against the [Fund]." *Ibid.* In particular, the Commissioner has adopted regulations that govern the claims procedure under the Act. *See N.J.A.C.* 5:25–5.5. Those procedures require a five-step process for implementation when, as here, there has been a default by the builder. First, "the owner may file a request for payment with the [DCA]." *N.J.A.C.* 5:25–5.5(e)1. If the owner takes that step, then the DCA "shall inspect the home for the purpose of determining if the defect is covered by the warranty." *Ibid.* If the DCA determines that the defect is covered by the warranty, the owner is obliged to submit

to the DCA "two or more bona fide estimates acceptable to the Division for the work intended to be covered." *N.J.A.C.* 5:25–5.5(e)2. If the owner satisfies that obligation, the DCA must select "the lower or lowest" of the estimates. *Ibid.* Once the DCA accepts an estimate, the DCA "shall certify the amount of the award to the Treasurer, who shall make payment from the fund." *N.J.A.C.* 5:25–5.5(e)1. As a final safeguard for the trust funds held by the Fund, the regulations make clear that "[p]ayment shall be made *only* for work authorized in writing by the [DCA] and upon completion to the [DCA's] satisfaction." *N.J.A.C.* 5:25–5.5(e)2 (emphasis supplied).

Here, Aqua Beach completed the first step: upon a default by its builder,[3] Aqua Beach, as the representative of the condominium owners, requested that DCA pay, through the Fund, the sums needed to effect the repairs to the Aqua Beach condominium complex. Faced with that request, the Bureau inspected the condominium complex and determined that the covered repairs would be covered by the Fund in the same proportion as the warranty units bore to the total number of units affected. Having taken the correct first step, and having received a positive, albeit partial, response from the DCA, Aqua Beach's efforts went awry. Although the Bureau specifically requested in writing that Aqua Beach present the required minimum two estimates of the repair work to be performed, Aqua Beach did nothing. Despite repeated requests and the setting of a deadline, Aqua Beach did nothing. It was only after Aqua Beach sought review of the denial of its claim that it submitted the required minimum two estimates. However, even that effort was ill-fated, as Aqua Beach did not do so until almost three months after first advising the Bureau that the repair work had been completed, until at least five months

---

[3] As noted earlier, *supra*, 186 *N.J.* 7, 890 A.2d 924 (2005), the original builder of the Aqua Beach condominium complex, Hereford Associates, Inc., filed for bankruptcy protection before the complex was completed. As a result, the original builder was unavailable to correct the defects. The trustee in bankruptcy completed the condominium complex, and Aqua Beach succeeded to the trustee's role as representative of the owners.

after the repair work had been completed, and until nine months after, according to Aqua Beach's counsel, the Bureau purportedly authorized Aqua Beach to proceed with the repair work.

## C.

Aqua Beach asserts that these regulatory requirements are arbitrary, capricious and unreasonable. We disagree. Given the trust statutorily reposed in the Commissioner of DCA in respect of the management of the Fund, *N.J.S.A.* 46:3B–7a, we hold that there is nothing arbitrary, capricious or unreasonable in the procedures outlined in *N.J.A.C.* 5:25–5.5(e) requiring that a claimant against a trust fund make a claim, submit to an inspection, submit at least two estimates of the repair work to be performed, and await the DCA's approval before barging ahead. To that extent, we wholly endorse the reasoning of the Appellate Division in both *Fisch v. Bureau of Constr. Code Enforcement*, 238 *N.J.Super.* 410, 570 *A.2d* 2 (App.Div.1990), and *Lakhani v. Bureau of Homeowner's Prot.*, 356 *N.J.Super.* 132, 811 *A.2d* 918 (App.Div. 2002). In the absence of any claim of untoward behavior by the DCA, a homeowner's informed decision to contract for repairs without the Bureau's pre-authorization voided any obligation on the part of the Fund to reimburse the homeowner for those repairs.

In short, as the Administrative Law Judge below correctly held, the answer to Aqua Beach's entreaties lies in *Elliott v. Cmty. Affairs Dep't,* 95 *N.J.A.R.2d* (CAF) 81, at *5 (1995): "Petitioners cannot omit these explicit procedures [set forth in *N.J.S.A.* 5:25–5.5(e)] and expect reimbursement for repairs they alone authorized and upon their own agreed-upon price. For these reasons, the merits of petitioners' claim cannot be reached."

## D.

We reach, then, Aqua Beach's last argument: that it had received oral authorization from the Bureau's engineer to proceed with the repairs and, hence, the Bureau is equitably estopped from

asserting a failure to comply with the repair pre-authorization requirements of the governing regulations. "Although the doctrine of equitable estoppel is rarely invoked against a governmental entity, this Court has long held that the prevention of manifest injustice provides an exception to the general rule." *Casamasino v. City of Jersey City,* 158 *N.J.* 333, 354, 730 *A.2d* 287 (1999) (citing *County of Morris v. Fauver,* 153 *N.J.* 80, 104, 707 *A.2d* 958 (1998); *Vogt v. Borough of Belmar,* 14 *N.J.* 195, 205, 101 *A.2d* 849 (1954)). Thus, assuming Aqua Beach can demonstrate a "manifest injustice," in order to assert the equitable defense of estoppel, Aqua Beach nevertheless must show that the DCA "engaged in conduct, either intentionally or under circumstances that induced reliance, and that [Aqua Beach] acted or changed [its] position to [its] detriment." *Knorr v. Smeal,* 178 *N.J.* 169, 178, 836 *A.2d* 794 (2003) (citing *Miller v. Miller,* 97 *N.J.* 154, 163, 478 *A.2d* 351 (1984)). Aqua Beach can vault neither obstacle.

Our earlier discussion concerning whether the Commissioner's regulations are arbitrary, capricious or unreasonable applies with equal force here. Clearly, the even-handed application of fairly adopted and clear regulations debunks any claim of "manifest injustice." Furthermore, as the Administrative Law Judge held in the temporary remand, Aqua Beach presented no competent proofs to support its equitable estoppel allegations. Indeed, even Aqua Beach's counsel—the person on Aqua Beach's behalf who had the telephone conversation with the Bureau's engineer when, Aqua Beach alleges, it received approval to proceed without any estimates whatsoever—flatly failed to make that claim in his certification to the OAL. Given the paucity of this record on the point, the facts supporting Aqua Beach's assertion of the doctrine of equitable estoppel simply do not rise to the level of a manifest injustice and, hence, Aqua Beach's claim must be rejected.

## III.

In sum, we hold that the Bureau's regulations requiring that a claimant under the Home Warranty Program submit to the Bu-

reau "two or more bona fide estimates acceptable to the Division [of Codes and Standards of the DCA] for the work intended to be covered," *N.J.A.C.* 5:25–5.5(e)2, as a condition precedent to certification by the Director of the Division to the State Treasurer for payment from the Home Warranty Security Fund, *N.J.A.C.* 5:25–5.5(e)1, for "work authorized in writing by the [DCA] and upon completion to the [DCA's] satisfaction," *N.J.A.C.* 5:25–5.5(e)2, are neither arbitrary, nor capricious, nor unreasonable, either as written or as applied here. We further hold that, under the circumstances presented in this appeal, there was no legally competent evidence on which to base any equitable estoppel claim against the Bureau.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA–SOTO—7.

*Opposed*—None.