22 A.3d 150 (2011)
421 N.J. Super. 43
Shonda HAYES, Petitioner-Appellant,
v.
BOARD OF TRUSTEES OF the POLICE AND FIREMEN'S RETIREMENT SYSTEM, Respondent-Respondent.
Docket No. A-2967-09T1.
Superior Court of New Jersey, Appellate Division.
Argued October 12, 2010.
Decided July 13, 2011.
*152 Samuel M. Gaylord argued the cause for appellant (Gaylord Popp, attorneys; Mr. Gaylord, Trenton, on the brief).
Danielle P. Schimmel, Deputy Attorney General, argued the cause for respondent (Paula T. Dow, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Ms. Schimmel, on the brief).
Before Judges LISA, REISNER and ALVAREZ.
The opinion of the court was delivered by
ALVAREZ, J.A.D.
Petitioner Shonda Hayes appeals from the February 9, 2010 final agency decision of respondent Board of Trustees (the Board) of the Police and Firemen's Retirement System (PFRS) denying her application for accidental disability retirement (ADR) benefits under N.J.S.A. 43:16A-7. ADR benefits are paid at a higher rate than ordinary disability retirement benefits. See Patterson v. Bd. of Trs., State Police Ret. Sys., 194 N.J. 29, 43, 942 A.2d 782 (2008). The Board concluded that N.J.S.A. 43:16A-7(1), which ordinarily requires filing within five years of the traumatic triggering event, rendered petitioner's application out-of-time. For the reasons that follow, after our review of the record and applicable law, we reverse and remand.
Petitioner, a Trenton Police Officer, applied for ADR benefits on July 20, 2007.[1] After the Board denied her application, she filed an appeal transmitted for hearing to the Office of Administrative Law (OAL). The Administrative Law Judge (ALJ) rendered an initial decision granting her benefits on May 6, 2009.
On June 9, 2009, the Board remanded the matter for the ALJ to answer certain designated questions, including a request that he pinpoint the date of manifestation of petitioner's stipulated disability, post-traumatic stress disorder (PTSD). After a second hearing, the ALJ again found that although the events which triggered petitioner's PTSD occurred on December 20, 2001, she was nonetheless entitled to receive ADR benefits because she did not become aware of her disability until May 2007.
The Board rejected the ALJ's analysis. It adopted the ALJ's findings of fact, but concluded petitioner's filing was untimely because of the five-year limit found in N.J.S.A. 43:16A-7(1), and awarded her only ordinary disability benefits. This appeal followed.
Preliminarily, we note that where a permanently disabling mental injury can be traced to "a mental stressor. . . identifiable as to time and place, undesigned *153 and unexpected, external to the member . . . that occurred during and as a result of the member's duties, and was not the result of the member's willful negligence, [it] can qualify the member for [ADR benefits]." Patterson, supra, 194 N.J. at 48, 942 A.2d 782. The event must be horrific, one which falls outside the employee's job description, and for which he or she is not trained. Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 30-32, 17 A.3d 801 (2011). PTSD is a qualifying psychiatric diagnosis of a permanently disabling mental injury that can constitute the basis for ADR benefits. See Brunell v. Wildwood Crest Police Dep't, 176 N.J. 225, 239-48, 822 A.2d 576 (2003).
Though the facts are stipulated, they bear repeating. The sole witness at the first administrative law hearing was petitioner, who became a Trenton Police Officer in September 1994. She testified that her service was unremarkable until March 1998, when she was dispatched on a stolen motor vehicle call. As police stopped the car and approached, the car "ran over" one of the responding officers. Police, including petitioner's partner, responded with gunfire, severely injuring the unarmed teenage driver and killing his fifteen-year-old female passenger. Other than the car's occupants and petitioner, no one at the scene was African-American. The incident was highly publicized, quite controversial, and drew much unwelcome attention to petitioner. After this event, she missed a tour of duty, or approximately four days of work.
On December 20, 2001, petitioner responded to a domestic violence call. An officer was reported to have been injured at the scene. Upon arrival, she discovered the wounded officer was her younger brother, who had been shot in the face and neck. Petitioner cradled her brother in her arms, certain he was going to die, as he lay on the ground bleeding profusely. Shots were still being fired, so petitioner and her sergeant dragged her brother out of harm's way into the rear of a nearby police wagon, which was blocked in by other police vehicles. Because there were no handles in the interior of the compartment, her sergeant had to repeatedly knock on the door from the inside to ensure others were aware of their presence while they waited for the shooting to die down. Petitioner's brother survived, albeit with significant residual health issues from his injuries.
After that incident, petitioner took leave for about three weeks, during which she received some counseling.[2] For approximately one month after her return, she was assigned exclusively to administrative work. Petitioner resumed patrol duties when her captain suggested it, however, to avoid being viewed as a "shirker" by her co-workers. Although she thereafter intermittently experienced anxiety and insomnia, petitioner continued to function on the job. Petitioner came to believe her state of unease was actually the norm for some police personnel.
In the late summer of 2006, while continuing to serve as a patrol officer, petitioner learned a "hit" had been put out on her by a Trenton gang. She also learned the driver of the vehicle involved in the 1998 shooting had been released from prison; petitioner assumed he knew her name, *154 as the incident had been so widely reported in the media.
These circumstances set the stage for petitioner's otherwise inexplicable reaction when, in September 2006, she was reprimanded by her captain because she refused to allow a civilian employee access to her police computer. After petitioner began to cry uncontrollably despite the relatively inconsequential nature of the incident, her gun was taken and she was placed on indefinite leave.
For reasons not clear from the record, petitioner was not seen by a psychiatrist until December 2006, nearly four months later. Petitioner testified that she stopped treatment after February 2007 because she could not afford to pay for the sessions or the medication.
At the first OAL hearing, petitioner explained she did not complain about her PTSD symptoms because she feared losing her job or seeming like a coward, in addition to believing at least some other officers normally experienced the same symptoms. Even though she intermittently experienced severe anxiety, insomnia, and similar difficulties, she simply coped as best she could. As she described it, "I had those problems, yes, but I just never s[ought]no one ever really told me I should be seen. . . ."
In May 2007, petitioner's captain told her he had received her "papers" from the doctor,[3] who recommended against her continued employment as a police officer. She was then terminated.
Based on the testimony, the ALJ opined that petitioner's "failure to file within five years is explained by delayed manifestation," consistent with In re Crimaldi, 396 N.J.Super. 599, 935 A.2d 836 (App.Div. 2007). In Crimaldi, we interpreted the parallel statute governing the Public Employees Retirement System (PERS) to mean that, where a traumatic event causes a disability which manifests itself beyond the statutory five-year period, benefits should nonetheless be awarded if the ADR application is filed within a reasonable time thereafter. Crimaldi, supra, 396 N.J.Super. at 605-06, 935 A.2d 836. We remanded the case so the PERS Board of Trustees could engage in a more "fact-sensitive analysis" as to whether the employee filed within a reasonable time after the delayed manifestation of symptoms. Id. at 607, 935 A.2d 836.
Here, the ALJ reasoned that since petitioner continued to function in the workplace after the December 2001 traumatic event, believing she could do so indefinitely, the disability did not "manifest" itself until she was informed in May 2007 that she was "incapable of performing police duties" and had to be terminated from employment. Therefore, since she applied for benefits in July 2007, within a reasonable amount of time after manifestation, the five-year limit did not bar her claim for accidental disability benefits. See ibid.
During the remand hearing, the ALJ heard testimony only from Dr. Chiappetta, the Board's expert. In his subsequent December 12, 2009 decision, the ALJ reiterated that the triggering traumatic event was petitioner's brother's December 20, 2001 shooting and that petitioner worked while suffering from PTSD symptoms. As the ALJ observed, for years thereafter "petitioner had no insight into the depth of her condition." Thus, he opined, petitioner's claim fell squarely within the Crimaldi *155 exception. He recommended a second time that she be awarded ADR benefits.
The Board stated that it adopted the ALJ's factual findings but rejected his legal conclusion. The Board agreed that petitioner was disabled by PTSD, triggered by the traumatic events occurring on December 20, 2001 but went on to state that it was the late summer of 2006 when "incapacity became apparent" during her breakdown at the station:
However, the ALJ fails to make a finding that in September 2006, Ms. Hayes stopped working or recognize [sic] the relevancy of that fact. The ALJ instead recites that her employer recommended in May 2007 that she seek a retirement and relies on this fact to conclude that manifestation of her disability occurred in May 2007.
Accordingly, the Board calculated petitioner was required to file by December 2006no less than five years from the December 20, 2001 traumatic event involving her brother. Because she did not file until seven months later, on July 20, 2007, the Board disallowed ADR benefits. The Board saw no "delayed" manifestation beyond the five-year term which would exempt petitioner from the five-year time bar pursuant to Crimaldi.
The statute provides:
The application to accomplish [accidental disability] retirement must be filed within five years of the original traumatic event, but the board of trustees may consider an application filed after the five-year period if it can be factually demonstrated to the satisfaction of the board of trustees that the disability is due to the accident and the filing was not accomplished within the five-year period due to a delayed manifestation of the disability or to other circumstances beyond the control of the member.
[N.J.S.A. 43:16A-7(1).]
Judicial review of an agency's final decision is limited. We ask the following:
(1) whether the agency's decision offends the State or Federal Constitution;
(2) whether the agency's action violates express or implied legislative policies;
(3) whether the record contains substantial evidence to support the findings on which the agency based its action; and
(4) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
[George Harms Constr. Co. v. N.J. Tpk. Auth., 137 N.J. 8, 27, 644 A.2d 76 (1994) (citations omitted).]
Therefore, "[o]ur function is to determine whether the administrative action was arbitrary, capricious or unreasonable." Burris v. Police Dep't W. Orange, 338 N.J.Super. 493, 496, 769 A.2d 1112 (App. Div.2001) (citing Henry v. Rahway State Prison, 81 N.J. 571, 580, 410 A.2d 686 (1980)); see also Aqua Beach Condo. Ass'n v. Dep't of Cmty. Affairs, 186 N.J. 5, 16, 890 A.2d 922 (2006). "The burden of demonstrating that the agency's action was arbitrary, capricious or unreasonable rests upon the [party] challenging the administrative action." In re Arenas, 385 N.J.Super. 440, 443-44, 897 A.2d 442 (App.Div.), certif. denied, 188 N.J. 219, 902 A.2d 1236 (2006); McGowan v. New Jersey State Parole Bd., 347 N.J.Super. 544, 563, 790 A.2d 974 (App.Div.2002); Barone v. Dep't of Human Servs., 210 N.J.Super. 276, 285, 509 A.2d 786 (App.Div.1986), aff'd, 107 N.J. 355, 526 A.2d 1055 (1987).
Nonetheless, we are not bound by an agency's decision on a question of law. Thurber v. City of Burlington, 191 N.J. 487, 502, 924 A.2d 533 (2007). While we accord substantial deference to an agency's interpretation of statutes it was *156 created to enforce, we still reverse where the decision is "plainly unreasonable." Stevens v. Bd. of Trs., 294 N.J.Super. 643, 652, 684 A.2d 104 (App.Div.1996) (internal quotation omitted). Similarly, the agency need not defer to an ALJ's legal conclusions, although there remains a "particularly strong need for careful appellate review" where an agency's factual findings are contrary to those of the ALJ. In re Lalama, 343 N.J.Super. 560, 565, 779 A.2d 444 (App.Div.2001).
The primary goal of statutory interpretation is to "discern and give effect to the legislative intent in light of the language used and the objects sought to be achieved by the enactment of the statute." See State v. Lewis, 185 N.J. 363, 369, 886 A.2d 643 (2005); In re Broking, 381 N.J.Super. 260, 263-64, 885 A.2d 507 (App.Div.2005). In interpreting the relevant language, we "should strive to avoid statutory interpretations that `lead to absurd or unreasonable results.'" Lewis, supra, 185 N.J. at 369, 886 A.2d 643 (quoting State v. Gill, 47 N.J. 441, 444, 221 A.2d 521 (1966)).
As used in N.J.S.A. 43:16A-7(1), "manifestation" relates to the "disability." In the context of this case, the "disability" is not mere stress and anxiety, with which petitioner coped for years in performing her police duties, but a condition of such magnitude as to disable her from returning to police work. Something is "manifested" when it becomes "[c]learly apparent to the sight or understanding," when "show[n] or demonstrate[d] plainly." Webster's II New College Dictionary 665 (1995). "Manifest" is synonymous with "obvious;" "manifested" is synonymous with "reveal[ed]." Ibid.
As we have said, the Board reasoned that petitioner's "total and permanent disability occurred in September 2006 when she ceased working." The Board cast this conclusion as a fact not inconsistent with the ALJ's findings, but merely an additional finding of fact. We reject this contention.
It is undisputed that petitioner stopped working in September 2006. But her absence was not expected, by petitioner or her employer, to be permanent. The Board ignored a critical finding of fact by the ALJ, which it adopted: "Between September 2006 and early 2007, petitioner was in treatment and could not yet know whether she would recover sufficiently to return to duty." Indeed, petitioner's employer did not know either. Petitioner's supervisors instructed her to engage in counseling, obviously with the expectation or hope that she would be able to resume active duty as she had in the past. It was not until May 2007, after petitioner followed her employer's advice and obtained treatment which was unsuccessful, and it was recommended that she not return to police work, that it became apparent to petitioner and her employer that she had become permanently disabled. The Board's contrary finding, that petitioner should have recognized that her suspension in September 2006 meant she was disabled, is a conclusion reached in hindsight which the record, including the facts found by the ALJ and adopted by the Board, does not support.
The "more fact-sensitive analysis" called for by Crimaldi leads to a different result. See Crimaldi, supra, 396 N.J.Super. at 607, 935 A.2d 836. Whether petitioner was out of work for three weeks or three months after the original traumatic event in 2001, it is undisputed she was able to resume her duties after some counseling. Even when events occurred in the late summer and fall of 2006 that made her PTSD unmanageable, namely, word that a Trenton gang was reportedly planning to kill her, as well as the pending release from prison of the driver from the 1998 *157 incident, petitioner reasonably believed that, after engaging in some more counseling, she would be able to return to work. After all, the events of 2006 paled in comparison to the trauma petitioner experienced in 2001 when her brother was shot while on duty, and after that incident she returned to work after only a brief hiatus.
In Crimaldi, the earliest possible delayed manifestation occurred more than five years after the traumatic event. Therefore, the issue was framed in terms of whether late filing was permissible "if the employee can show that the disability is not manifested until more than five (5) years after the accident." Crimaldi, supra, 396 N.J.Super. at 605, 935 A.2d 836 (internal quotation omitted). This language does not imply that a filing beyond the five-year limitation period can never be valid when a delayed manifestation occurs within five years of the traumatic event. In light of the remedial purposes of the legislation, we believe the reasonableness test should apply. But because we conclude petitioner's disability did not manifest itself until after the five-year deadline, as determined by the ALJ, we need not decide the issue.
Our analysis comports with the position advanced by the PERS Board in Crimaldi as to the time of delayed manifestation. There, the PERS Board asserted the petitioner "clearly knew of his disability [resulting from a traumatic event of August 5, 1994] by May 2001 when he was terminated from his second job." Crimaldi, supra, 396 N.J.Super. at 605, 935 A.2d 836. The critical fact is when the petitioner "knew or should have known that he was totally and permanently incapacitated from his duties." Ibid. In Crimaldi, the petitioner worked intermittently during the years between the traumatic event and his eventual termination, when he was terminated because his condition progressed to a point where he could no longer perform his duties satisfactorily. Id. at 602-03, 935 A.2d 836. Yet it was undisputed the manifestation of total permanent disability did not occur until he was terminated. It was not until then that the petitioner and his employer were aware of it.
In cases of mental illness, manifestation is not necessarily synonymous with awareness. It is because of the difficulties inherent in the diagnosis of psychiatric illness that the "mental-mental" category of injuries has sparked so much litigation and debate. Patterson, supra, 194 N.J. at 40-48, 942 A.2d 782. This is particularly true of PTSD, only recently recognized as a genuine psychiatric disability. Brunell, supra, 176 N.J. at 240-41, 822 A.2d 576.
The ALJ elected May 2007 as the date of delayed manifestation because petitioner literally did not know she was disabled until she was told she could not return to work. By contrast, the Board's selection of September 2006 as the date of "manifestation" of petitioner's PTSD was inconsistent with the ALJ's factual findings, which the Board claimed to adopt. To petitioner, the state of mind induced by her PTSD had become the norm. It is self-evident that mental health disabilities, unlike a broken bone or chronic pain, are not always obvious to the person suffering from the symptoms. See Patterson, supra, 194 N.J. at 48-49, 942 A.2d 782 (diagnostic difficulties of connecting an event to the resulting psychiatric injury are greater than when diagnosing the consequences of a physical injury). Petitioner simply did not understand that she had come to suffer from a crippling disability until she was informed of this fact by her employer. Thus, the record establishes that the manifestation was delayed, bringing petitioner's claim within the Crimaldi exception.
As we have previously said, a delay in an injured worker seeking disability benefits *158 is rare rather than common. Crimaldi, supra, 396 N.J.Super. at 607, 935 A.2d 836. Allowing this delayed filing will not significantly impact the number of such claims, or "be inconsistent with the liberal purposes behind our laws providing for disability pensions." Ibid. This particular claim was filed within two months of the member learning for the first time that she suffered from a disability preventing her from returning to her employment. That was a reasonable time within which to file the claim.
The final administrative determination is therefore reversed, and the matter is remanded to the Board with instructions to award ADR benefits to petitioner.
Reversed and remanded.
NOTES
[1] The application was subsequently amended to become effective October 2007 because of accumulated sick-leave. For purposes of our discussion, the relevant date is the July filing, as this amendment was made at the Board's direction for purposes unrelated to the issues considered on appeal.
[2] The Board retained a psychiatrist, Carl Chiappetta, as its expert. He examined petitioner and prepared a report indicating, among other things, that petitioner was relieved of her duties for three months, not three weeks. While testifying, petitioner stated she was relieved of her duties for about three weeks. The ALJ incorporated this statement into his findings of fact.
[3] The record does not identify the person who recommended petitioner be separated from her employment. Dr. Chiappetta, the Board's expert, prepared a report admitted into evidence during the remand administrative hearing, referring to an evaluation by a Dr. Shaw. The only mental health expert report in the record is from Dr. Chiappetta.