790 A.2d 974 (2002)
347 N.J. Super. 544
Joseph McGOWAN, Defendant-Appellant,
v.
NEW JERSEY STATE PAROLE BOARD, Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted October 10, 2001.
Decided February 15, 2002.
*976 Joseph McGowan, appellant pro se.
John J. Farmer, Jr., Attorney General, for respondent (Nancy Kaplen, Assistant Attorney General, of counsel; Larry R. Etzweiler, Senior Deputy Attorney General, Howard J. McCoach and Ellen Hale, Deputy Attorneys General, on the brief).
Before Judges STERN, COLLESTER and PARKER.
*975 The opinion of the court was delivered by PARKER, J.A.D.
On April 24, 1973, appellant, Joseph McGowan, was indicted for the rape and murder of a seven year old girl. Appellant pled guilty to first degree murder on June 19, 1974 and was sentenced on November 4, 1974 to a term of life imprisonment under N.J.S.A. 2A:113-1 and 2, now repealed and superceded by N.J.S.A. 2C:11-3.
Appellant was initially eligible for parole in 1987. He was denied release and given a twelve-year future eligibility term (FET). He became eligible for parole again in December 1994, at which time he received a twenty-year FET. That decision was appealed to the full Board on June 20, 1994 and affirmed on August 31 of that year. Appellant then appealed to us. We remanded the matter on April 30, 1997 in light of our decision in Trantino v. New Jersey State Parole Board, 296 N.J.Super. 437, 687 A.2d 274 (App.Div.1997), and ordered the Board to submit a more detailed statement of its reasons for both its denial of parole and imposition of a twenty-year FET. Pursuant to our order, on June 26, 1997, the Parole Board issued an amended notice of decision, along with a confidential addenda. The Parole Board stated that pursuant to N.J.A.C. 10A:71-2.1(a), it classified as confidential certain reports,
because they are evaluative, diagnostic and prognostic in nature and if released to the inmate could adversely affect the inmate's rehabilitation or future delivery of rehabilitative services. Specifically, the Panel is convinced that if these evaluations are released to the inmate, at *977 future evaluations the inmate would be aware of how certain responses given to certain questions presented by the examiner could impact the evaluation. The inmate, who has a history of being less than candid to the Parole Board regarding his motivation behind committing the offense and the facts of the offense, could potentially manipulate the results of the evaluation by reviewing past evaluations.
Appellant sought release of the confidential addenda, but we denied his motion on July 23, 1997. While we understand and appreciate the Board's concerns, at this time we find it more important to disclose the confidential reports so that appellant may appreciate the extent of the evidence considered by the Board in reaching its determination. In light of the Board's intention in classifying the addenda, we find no basis for not releasing it at this time. In this opinion, we refer to several reports and evaluations contained therein.
On May 27, 1998, we again remanded the matter in light of the Supreme Court's decision in Trantino v. New Jersey State Parole Board, 154 N.J. 19, 711 A.2d 260 (1998), and stated that the record was unclear as to whether there was a substantial likelihood that appellant would commit another crime if released on parole. Appellant appeared again for a hearing before the Board and on November 6, 1998, the Board denied parole and referred the case to a three-member panel of the Parole Board for determination of an appropriate FET. On January 7, 1999, the panel established a thirty-year FET. The full Board affirmed on August 2, 1999. In this appeal, we consider the August 2, 1999 decision.

FACTUAL BACKGROUND
On April 22, 1973, the nude body of a seven-year-old girl was found in the crevice of a large rock formation in Harriman State Park, New York. Her head was twisted under the left side of her body. The child had bled from the nose and had marked swelling of both eyes due to fractures of both orbits. Other injuries included lacerations of her lip and chin, a cervical fracture, dislocation of both shoulders, left temple abrasions, marked swelling in the front of the skull and three loose upper teeth.
Three days earlier, the child had left her parents' house to deliver two boxes of Girl Scout cookies to appellant, a neighbor who lived across the street with his mother and grandmother. At the time, appellant was a twenty-seven year old high school teacher with no prior criminal record. When the child failed to return home, her parents called the police. The police spoke with appellant on two occasions. When he contradicted himself, the police requested that he take a polygraph test which he did voluntarily. After he failed the polygraph, appellant requested a priest, to whom he confessed. He confessed again to the police, and revealed the location of the child's body.

PSYCHIATRIC/PSYCHOLOGICAL EVALUATIONS
On April 25, 1973, appellant was examined and evaluated by a psychiatrist, Noel C. Galen, M.D. Appellant reported to Dr. Galen that he was cutting the grass when the child came to deliver the Girl Scout cookies he had ordered some weeks before. When he entered the house to retrieve money, the child followed. He told Dr. Galen that he was embarrassed because he did not have the exact amount of money for the cookies, so he grabbed the seven year old and forced her into his downstairs bedroom. When Dr. Galen asked about his motive in taking the child downstairs, *978 appellant responded that he intended to rape her. Appellant ordered the child to remove her clothes in a "loud, forceful voice." He then "became excited enough to ejaculate" two or three inches from the child, though he claimed he "never completed the [sexual] act." Rather, he claimed that he ejaculated on his fingers and fondled the child's vagina. Contrary to appellant's assertions, however, the autopsy revealed the child suffered a ruptured hymen, severe vaginal bruising and semen traces in her vagina, indicating that appellant had penetrated her.
Appellant then told Dr. Galen, "[A]ll of a sudden I realized what I had done .... If I let her go ... my whole life was gone. All I could think of was just to get rid of her." The appellant then described the murder in detail.
... I grabbed her and started to strangle her and I dragged her off the bed, tossed her into the corner of my room on the tile floor off the rugs .... She was trying to, you know, scream, and was fighting back, but of course she really couldn't, since I had my hands around her throat. Uh ... she stopped struggling. Just sort of lay there. I got dressed.... I had been sweating so violently .... I went out to the garage. I got some plastic bags to put her in. [Returning from the garage] I saw that she was still moving so I began strangling her again and I hit her head on the floor repeatedly. She began to bleed from the nose, mouth, face, I don't know where. There was blood all over the floor. I then grabbed one of the plastic bags and put it over her head and twisted it tightly and held it there until she stopped.
Appellant then put the victim in a plastic bag, wrapped her in an old couch cover, tied the bundle with cord, placed the body in the trunk of his car and cleaned up the blood with old T-shirts. Appellant then drove approximately fifty miles to New York State and dumped the child's body down an incline in Harriman State Park. He unwrapped the body, placed it under a rock ledge and put the plastic bags and couch cover in a roadside garbage can. He then returned to his home and joined the search for the child. He later said, "I felt better when I went back to the house. I slept well."
In his June 6, 1973 report, Dr. Galen related that appellant "has given a well-documented history of sexual attraction to young girls. This, coupled with a clearly evident picture of a dominating and overprotective mother, would strongly hint at some profound problems in [relation] to his making a normal adjustment to an adult woman." Dr. Galen speculated that "younger girls would pose no threat to his rather shaky concept of his manhood." The psychiatrist based his opinion on appellant's admission that he had been sexually aroused by young girls for about a year prior to the murder and, more specifically, that he had been aroused by his twelve year old cousin. Appellant also admitted to both masturbation and rape fantasies and attraction to ten and eleven year old girls.
On May 10, 1973, psychologist Emanuel Fisher, Ph.D., administered a battery of psychological tests to appellant. Dr. Fisher reported that "psychologically," Mr. McGowan emerges as "an exceedingly labile, tense and hysterical personality whose tendency is to act out mood and impulse in a very explosive manner. Rational controls are weak, despite the fact that he is an exceedingly brilliant individual." Dr. Fisher found that appellant had "a tremendous amount of underlying, unconscious hostility" and that he "repressed, avoided, sublimated, and intellectualized." Although appellant came across as "a very *979 proper, conventional, conforming individual, [t]his exaggerated propriety, conventionality and conformity, constitute his defensive facade, for himself and for others, against the underlying depression and hostility of which he is unconscious."
Appellant's history of attraction to young girls, as well as repression and intellectualization, was reiterated in an October 13, 1973 neuropsychiatric report by Abraham Effron, M.D. After relating to Dr. Effron his "fantasies of sexual relations with little girls," appellant recalled that while working as a summer camp counselor at age nineteen, he became sexually aroused when a particular girl sat on his lap. He also repeated a detailed description of the rape and murder to Dr. Effron.
Dr. Effron interviewed appellant's mother who related that appellant's father "was much closer to the boy [than she was] and would take him out often." His father died of a heart attack while appellant was in college. After appellant completed college, he moved back home to reside with his mother and remained there until he was arrested. Dr. Effron concluded that:
He does not show what he necessarily feels .... He conceals many facets of his complex true self and his true identification and related emotional difficulties. He tries to hide his inability to truly establish his masculinity .... He experiences tension whenever he gets close to the opposite sex .... This passivity generates anxiety which in turn feeds on itself and results in a higher state of tension which must expiate itself in a complete loss of self-control or sexual release.
....
He manages to control an underlying psychosis by intellectually holding in abeyance his primitive drives to an inordinate extent, but as in the past and tragically in the recent past, he may act out again.
Eugene Revitch, M.D., evaluated appellant at the State Diagnostic Center in July 1974. Addressing the psychodynamics of the offense, Dr. Revitch determined that "it was not a cold-blooded murder, but something committed in a state of extreme emotional disorganization and pressure.... The killing was the consequence of an additional upset and failure due to premature ejaculation." At that time, Dr. Revitch indicated, "[T]here was a degree of dissociation with use of mechanism[s] of denial." Appellant admitted to Dr. Revitch that he had rape fantasies in college which were awakened by frustration and anxiety and that "raping a woman would give him a feeling of being better." Dr. Revitch interviewed appellant with and without using sodium amytal (commonly known as "truth serum"). There was no significant change in appellant's description of the crime while he was under the influence of the drug. The most significant effect of the sodium amytal was that appellant's affect while describing the crime remained flat and did not reflect any deep seated emotions he may have attempted to mask. Moreover, appellant did not initially reveal his sexual fantasies to Dr. Revitch as he did with previous evaluators but did so while under the influence of the drug.
Dr. Revitch concluded, "We believe these events only occur once in a lifetime of such individuals. A series of circumstances are necessary to provoke the incident. If the girl had not come to his home that day or, perhaps, if he had two dollars instead of only one dollar and a twenty dollar bill, the event would not have taken place, at least at the present."
Dr. Revitch's conclusion was not completely consistent with the prior reports or with appellant's earlier admission to having *980 a history of violent outbursts. In the past, appellant said he released his anger by "breaking something."
From 1978 to 1990, eight other reports were generated regarding appellant. All appear to be based on short interviews and indicate appellant's current status based solely upon his self-reporting. None of these reports addressed the issues raised by the early psychological evaluations nor did they discuss the details of appellant's psychological profile or treatment since incarceration. The January 27, 1987, October 13, 1988 and September 30, 1991 reports recommended him for parole and indicated that he admitted his guilt and appeared remorseful.
The next in-depth psychological evaluation was done on October 7, 1993 by Kenneth McNiel, Ph.D., Principal Clinical Psychologist at the Adult Diagnostic and Treatment Center at Avenel. This evaluation was done at the request of the Parole Board to assess appellant's "(1) likelihood of violent acting-out; (2) general personality profile; (3) presence/absence of severe psychological problems; and (4) treatment program recommendations."
The most significant aspect of this 1993 evaluation was appellant's denial of "any history of sexual fantasies or behaviors toward children prior to or subsequent to his crime." This denial was a marked change from his 1973 admissions to Drs. Galen, Effron and Revitch. Dr. McNiel noted that, "[w]hile Mr. McGowan also denied any dissociative symptoms, his discussion of the present offense was notable for brief moments in which he would blank and look away while discussing the crime, which suggested a dissociative process.... [I]t was clearly difficult for him to concentrate on specific memories of his crime." Again, this was a significant change from the 1973 evaluations in which he described the crime in vivid detail. Dr. McNiel found "no evidence to indicate Mr. McGowan is at imminent risk of violent behavior," but emphasized "that in a non-structured community setting ... his ability to manage anger, rejection and feelings of sexual inadequacy remains open to question." Significantly, Dr. McNiel concluded
that Mr. McGowan has made little or no progress in fully appreciating the extent of sexual deviance and violence that is apparent in his crime. Unfortunately, it appears that he continues to primarily manage such negative aspects of himself through denial and repression, similar to the time of his crime.
Dr. McNiel evaluated appellant again in August and September 1998 at the request of the Parole Board. At that time, appellant was "emotionally over controlled and schizoid in his demeanor." Appellant again denied his earlier admissions of rape fantasies and sexual attraction to young girls. He attributed his crime to the fact that "the victim happened to come to his home during a moment of [his] abject despair in which he had been actively planning to kill himself for weeks but had been unable to follow through with his suicide plans." When appellant saw the seven year old child delivering Girl Scout cookies, "he became overwhelmed with unexplainable feelings of rage ...."
Dr. McNiel indicated that his 1998 evaluation was generally consistent with the 1993 evaluation. He found appellant's clinical presentation that of "a schizoid, chronically depressed, socially avoidant individual, with a history of impulsive rage reactions." Dr. McNiel expressed clinical concerns with appellant's "potential for dissociation at times of anger, and also the likelihood of severe sexual pathology involving pedophelia and sexual violence, which he continues to deny." Dr. McNiel found that appellant had "paranoid tendencies *981 and significant violence potential." In 1998, Dr. McNiel concluded that "[g]iven Mr. McGowan's continued inability to deal with the sexual aspects of his crime, it would appear that he has made very little progress in confronting the pedophilic impulses and sexual sadism that erupted in his crime. As such, he should be considered a poor risk for parole."

THE OCTOBER 1998 PAROLE BOARD HEARING
In October 1998, the Parole Board heard nearly nine hours of testimony from appellant. During this testimony, appellant claimed that he first became aware of his depressant personality and his underlying anger at his mother in 1994. He acknowledged that this anger played a pivotal role in his crime, but he "didn't really feel that discussing this was needed." As a result, he had only received about three and one-half to four hours of therapy on the subject. The therapy he did receive regarding this anger led him to "realize[ ] that a lot of the anger I felt towards people ... is simply because they ... directly did something that reminded me [of my mother]." He testified that he failed to discuss this with the Board in 1994 because he had not "realized its total influence" at that time. Although appellant admitted that his "overwhelming feeling of sexual inadequacy" can be traced to his mother, he had never discussed that fact in therapy. He did indicate, however, that he would "always remain in therapy."
Appellant further testified that he never realized the impact of his crime on the victim's family until he saw a commercial made by the victim's mother for a gubernatorial primary election. When he first saw the commercial, he "almost threw up because it was so chilling .... I hadn't seen these people ... since ... 1974, and I hadn't suspected how much it affected them, but seeing that commercial really drove it home, how much I had taken from them, and how much pain I had caused them." Nevertheless, appellant did not discuss his reaction to the commercial in therapy because "[t]here's nothing I can do. I cannot change that. I cannot go back and bring that little girl back."
During the hearing, appellant acknowledged that he failed to mention in any of his psychological evaluations or therapy sessions that in 1970, as a teacher, he briefly dated a sixteen year old student even though he knew it was a violation of school policy and could damage his career. Even in his October 1998 parole hearing, twenty-eight years later, appellant denied the incident until he was confronted with an article from the Rockland Journal News concerning it. He claimed that he did not want to cause problems for her. When asked why he would risk his teaching career to date a minor, appellant stated that he now understood it was a chance to be in a "superior position" to the sixteen year old student. Appellant acknowledged that he lied to prior evaluators and therapists when asked if he had dated girls under eighteen when he was an adult.
During the 1998 hearing, appellant also denied ever having had sexual fantasies about young girls, contrary to his earlier admissions. Other than discussing the one instance when he became aroused by watching his twelve year old cousin, appellant denied ever having spoken about any pedophilic tendencies in therapy. According to appellant, the incident involving his cousin was as a "pure sexual response ... age didn't matter."
Appellant testified that on the day of the murder, he had been contemplating suicide because he felt he was a total failure. "My last little success in life was my teaching, and now I had just screwed that up .... I'm not dating anyone ... I have no relationships. *982 I'm not going anywhere. I mean, here it is Easter, and most of my friends are taking off on an Easter trip, either down to Florida, or Mexico, or going somewhere, and I'm sitting around doing nothing." He did not kill himself, however, because he was "too cowardly to do it." "The doorbell rings, this poor little girl is standing there, and the thought flashes across my mind, Well, you can't kill yourself. Can you kill that?"
When asked by a Board member,
Q. What's in your mind when you let her in the door?
A. Thoughts of killing her.
Q. Why?
A. Just because I wanted to destroy.... I just wanted to kill.
When asked to discuss his earlier statements that the murder was motivated by not having the correct change to pay for the Girl Scout cookies, appellant responded that it was "a total fabrication." He also testified that his 1973 admissions to Dr. Galen about pedophilic fantasies were fabricated in an attempt to gain admission to a sex offenders unit because he had been told that "after a few years of therapy, they let you go." When asked why he lied, appellant replied, "I will say almost anything when I'm scared." He admitted that he had been "very, very reticent to discuss stuff with officials," including members of the Parole Board because he was concerned his disclosures would get to the media. He said he no longer had those concerns, however, since "Trantino's decision." Nevertheless, appellant was still guarded in his testimony, stating, "I don't want to waste time on trivia, I mean, open up a can of beans when no one cares about it."
On May 28, 1999, the Board interviewed Dr. McNiel with respect to his examination of appellant. Dr. McNiel explained the tests referred to in his report and the results which showed high scores for overt paranoid delusional thinking and anti-social behavior. He indicated that while appellant is in the highly structured, controlled prison environment he is stable and functions quite well. He expressed great concern, however, that appellant still remains dangerous:
On the one hand you have a horrific, emotionally charged crime and on the other hand you have an individual who had no prior criminal history .... I'm seeing him twenty years after being in prison and he's got no history of the impulsive acting out, aggressive impulse control problems that perhaps would help explain the violent nature of his offense .... [I]t seems that in Mr. McGowan's case, for the last number of years he has been able to do quite well in prison, obvious[ly] prison is a highly structured and controlled environment and often ... particularly a paranoid individual, who need[s] a lot of external controls[,] respond[s] very well to systems that have rigid order and in fact in talking to Mr. McGowan he described a lifestyle which is very rigid ... he was eating ... breakfast with the same individual every day, he eats all the rest of his meals in his cell, and really his day is very scheduled and very ordered .... [H]e's very calm and very intellectualized and [exhibits] very little affect in talking to him .... [W]hen I first asked him about his crime he was able to talk about the general nature of the crime very easily .... But he glossed over most of the details ... I spent a lot of time confronting and asking him direct questions about specific details .... [I]t was clear after a while that this became emotionally charged for Mr. McGowan.
....
I would say his overall insight into his character, if you will, is at least fair ...

*983 is better due to the counseling he has had in that regard. However in terms of his insight into the crime itself, he is really still unable to explain at all things like, why a little girl as opposed to someone else, why the brutality of the murder, why the sexual assault, because he denies any history of deviant sexual fantasies that involve children ...
McNiel concluded that appellant was still dangerous and "at risk for acting upon [his] anger in an unpredictable irrational way if the anger were to ever become extreme and he were in a situation where there were not immediate controls on his behavior."

THE NOVEMBER 1998 PAROLE BOARD DECISION
In making its decision to deny parole, the Board relied substantially on appellant's own extensive testimony and Dr. McNiel's evaluation. The Board noted that in its 1994 decision to deny parole, it made a series of recommendations for what appellant should do prior to his next hearing. In reviewing the record since the 1994 hearing, the Board noted, "your lack of progress in reducing the likelihood of future criminal behavior since your last parole hearing in 1994, and for that matter since your arrest in 1973 is stunning."
The Board then reviewed the applicable factors in N.J.A.C. 10A:71-3.11(b). The Board first considered the facts and circumstances of the offense and the "brutality" of the crime, N.J.A.C. 10A:71-3.11(b)5, and found that appellant's lack of insight into what caused him to commit this offense was "extremely disconcerting." The Board was particularly concerned that appellant had made so little progress in addressing the issues that led to the commission of the crime and expressed the opinion that the reason for minimal progress was appellant's lack of candor with the various psychologists and authorities. Notwithstanding the fact that appellant had engaged in many hours of counseling and therapy, he had received only four hours of therapy focusing on his anger at his mother, which appellant believed was a "primary motivator behind the commission" of the offense.
The Board also expressed concern about appellant's admissions that he was "over-intellectualizing" his responses to therapists regarding issues "at the crux" of his criminal behavior. This was compounded by his acknowledged lack of candor with authorities and psychologists, his lying about "incorrect change" as motivation for the murder, whether he masturbated prior to the killing, whether he ever had pedophilic fantasies and whether he had dated a minor while teaching.
The Board also considered whether there had been any change in appellant's attitude toward himself and others. N.J.A.C. 10A:71-3.11(b)11. Citing his lack of candor with therapists and refusal to discuss issues at the core of his criminal behavior, the Board found that appellant had shown no change in the way in which he addressed questions from both the Board and therapists since his incarceration in 1974, i.e., appellant continued to manipulate and intellectualize his responses.
In discussing appellant's mental and emotional health, N.J.A.C. 10A:71-3.11(b)13, the Board opined that it was not "far different than it has been in the past, and it remains substantially likely [that appellant] would commit a crime if released on parole."
The Board noted that appellant had no concrete plans regarding living and working arrangements and that he had "no support system beyond the prison walls." N.J.A.C. 10A:71-3.11(b)14. The Board found that appellant did not have "a realistic *984 view of the problems [he] will face if paroled," nor did he have "an adequate plan as to how to address stressful situations" given his lack of non-institutional support.
Although the Board acknowledged that appellant had "remained free from serious disciplinary infractions," it believed that the preponderance of the evidence showed "a substantial likelihood [he] would commit a new crime if released on parole." The Board concluded that appellant was at risk to re-offend and could not be released unless he "candidly and fully" discussed those issues at the heart of his criminal behavior with a therapist.
In its November 6, 1998 decision, the Board referred the FET determination to a three-member panel of the Board pursuant to N.J.A.C. 10A:71-3.21(d). On January 7, 1999, the three-member panel largely reiterated the discussions above and addressed several other factors in explaining its imposition of a thirty-year FET. First, because of the Appellate Division's remand of its initial decision, any FET imposed would be calculated from May 1993, not January 1999. Second, statutory credits will reduce appellant's FET if he remains free of institutional infractions. Third, since appellant is entitled to an annual review hearing as a Title 2A offender, the Board may assess appellant's progress and institute a parole hearing should his situation change.
Appellant appealed administratively to the full Board and on August 2, 1999, the full Board affirmed the November 1998 decision and the January 1999 determination of a thirty-year FET.

DISCUSSION
In our May 27, 1998 remand to the Board, we directed that the Board consider the matter in light of the Supreme Court's decision in Trantino:
The test for parole fitness ... is whether there is a substantial likelihood the inmate will commit a crime if released on parole. Rehabilitation is relevant under that test only as it bears on the likelihood that the inmate will not again resort to crime. It need not be total or full or real rehabilitation in any sense other than there is no likelihood of criminal recidivism.
[Trantino, supra, 154 N.J. at 31, 711 A.2d 260.]
In reviewing the Board's denial of parole, Trantino directs us to focus on three inquiries: (1) whether the Board's action violates express or implied legislative policies, i.e., did the Board follow the law; (2) whether the record contains substantial evidence to support the findings on which the Board based its action; and (3) whether in applying the legislative policies to the facts, the Board clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors. Id. at 24, 711 A.2d 260. In a later decision, Trantino v. New Jersey State Parole Board, 166 N.J. 113, 175, 764 A.2d 940 (2001), the Supreme Court noted that the Board must apply "the statutory criteria to all of the relevant evidence." (quoting State in the Interest of C.A.H. & B.A.R., 89 N.J. 326, 344, 446 A.2d 93 n. 5 (1982)).
Initially, we note that appellant is serving a sentence imposed under Title 2A, the predecessor to the New Jersey Code of Criminal Justice now codified under Title 2C. Parole fitness, however, is governed by the Parole Act of 1979, N.J.S.A. 30:4-123.45 to 123.79. The current standard for Title 2A inmates involves a limited consideration of rehabilitation as it affects individual deterrence; i.e., whether there is a substantial likelihood that the inmate will commit a crime if released on *985 parole. Trantino, supra, 154 N.J. at 27, 711 A.2d 260, citing N.J.S.A. 30:4-123.56c.
We have carefully reviewed the entire record of the 1998 hearing and the Board's decision and we find that the Board applied the Trantino standard in determining whether to grant appellant's parole and that it considered the applicable factors in N.J.A.C. 10A:71-3.11(b). In addressing each of the applicable factors in N.J.A.C. 10A:71-3.11(b), the Board specifically discussed appellant's lack of rehabilitation as it related to his likelihood of recidivism.
Appellant argues that the Board applied the incorrect standard in that the Board did not consider all twenty-three of the factors enumerated in N.J.A.C. 10A:71-3.11(b). He argues several additional factors which he believes prove he is unlikely to commit a new crime if released. It is appellant's contention that the Board's failure to address all of the factors, by itself, amounts to the application of an incorrect standard. We do not agree.
There is no requirement for the Board to consider each and every factor enumerated in the Administrative Code. Rather, the Board must consider the factors applicable in each case. Here, the Board acknowledged that appellant had adjusted well to the institutional setting and that he had no significant disciplinary infractions. It also noted the several reports that recommended appellant for parole prior to 1994. As noted previously, however, those reports were not based on in-depth interviews or evaluations and were made by staff who lacked access to confidential data.
We disagree as well with appellant's claim that the Board lacked sufficient evidence to support its denial of parole. As with any administrative decision, a parole determination, may not be disturbed if the Board's findings are supported by "substantial evidence," i.e., evidence furnishing a reasonable basis for the agency's action. Zachariae v. Division of Real Estate Comm., 53 N.J.Super. 60, 62, 146 A.2d 491 (App.Div.1958). There is more than sufficient evidence in the record to support the conclusion that "there is a substantial likelihood the inmate will commit a crime if released on parole." Trantino, supra, 154 N.J. at 31, 711 A.2d 260.
We need not repeat here what we have detailed previously in this opinion. Suffice it to say that the testimony and report of Dr. McNiel is consistent with appellant's own testimony and it is his own testimony that is most revealing with respect to his lack of rehabilitation and likelihood of re-offending. We were particularly struck with his testimony that he lied in the 1973 evaluations with respect to his motive for the crime and by his statement that, "I will say almost anything when I am scared." We were struck, as well, by his testimony that he fabricated pedophilic fantasies so he could be placed in a sex offender's unit and be released after a few years of therapy. Given appellant's admission that he has lied repeatedly over the years, how can any of his assertions be deemed reliable? Based on appellant's own testimony, a "reasonable mind" could find the evidence sufficient to support the Board's conclusion that appellant is substantially likely to commit another crime if released. In reviewing all of the evidence, we conclude that it was sufficient to support the Board's finding that appellant has made no substantial progress in addressing the issues that led him to murder the child in 1973: he has regressed in that he now denies his earlier pedophelic fantasies and tendencies, he has lied and manipulated evaluators, played "word games" during parole hearings, and demonstrated a substantial risk for recidivism.
*986 Where the Board has applied the correct legal standard, a reviewing court is limited to determining whether the denial of parole was arbitrary, capricious or unreasonable. See Henry v. Rahway State Prison, 81 N.J. 571, 579-580, 410 A.2d 686 (1980). Administrative actions, such as parole decisions, must be upheld where the findings could reasonably have been reached on the credible evidence in the record. Close v. Kordulak Bros., 44 N.J. 589, 599, 210 A.2d 753 (1965). A court may not substitute its judgment for that of the agency, In re Polk License Revocation, 90 N.J. 550, 578, 449 A.2d 7 (1982), and an agency's exercise of its statutorily-delegated responsibilities is accorded a strong presumption of reasonableness. Newark v. Natural Resource Council in Dept. Env. Prot., 82 N.J. 530, 539, 414 A.2d 1304, cert. denied, 449 U.S. 983, 101 S.Ct. 400, 66 L.Ed.2d 245 (1980). The burden of showing that an action was arbitrary, unreasonable or capricious rests upon the appellant. Barone v. Dept. of Human Serv., Div. of Med. Asst., 210 N.J.Super. 276, 285, 509 A.2d 786 (App.Div.1986), aff'd 107 N.J. 355, 526 A.2d 1055 (1987). Appellant has not met that burden.
The Parole Board has broad but not unlimited discretionary powers in reviewing an inmate's record and rendering a release decision. Monks v. N.J. State Parole Bd., 58 N.J. 238, 242, 277 A.2d 193 (1971). The Board is directed by statute not to release a prisoner merely as a reward for good conduct, but only where there is a reasonable probability that he will rejoin society without violating the law. N.J.S.A. 30:4-123.14.
"Parole Board determinations are highly `individualized discretionary appraisals,' and ... should not be reversed by a court unless found to be arbitrary." Trantino, supra, 154 N.J. at 25, 711 A.2d 260, quoting Beckworth v. State Parole Board, 62 N.J. 348, 359, 301 A.2d 727 (1973). The test is essentially whether there was a rational basis for the decision.
Appellant argues that he has been a model inmate for almost 30 years. His behavior within the highly structured controlled prison environment, however, is not as significant as his own admissions during his testimony that he repeatedly lied during his evaluations, that he had only begun to address his anger in 1994 and that he still had little appreciation for the nature of his crime. The Board's finding that appellant had made little or no progress in understanding or addressing the deep-seated psychological bases for his violent rape and murder of a seven year old child is well documented in the record and the Board's decisions.
Appellant argues that N.J.A.C. 10A:71-3.21(a) establishes a Future Eligibility Term of twenty-seven months which may be expanded to thirty-six months pursuant to part (c) of that section, that the pre-July 1999 code applies to him, and that N.J.A.C. 10A:71-3.21(d), effective prior to June 7, 1999,[1] provided:
A three-member Board panel may establish a future parole eligibility date *987 which differs from that required by the provisions of (a) or (b) and (c) above if the future parole eligibility date which would be established pursuant to such subsections is clearly inappropriate in consideration of the circumstances of the crime, the characteristics and prior criminal record of the inmate and the inmate's institutional behavior.
The pre-July 1999 code does apply to appellant. His interpretation of it is incorrect, however. He argues that before the Board can extend the FET beyond thirty-six months, it is required to find evidence of all three factors: (1) the circumstances of the crime; (2) his characteristics and prior criminal record; and (3) his institutional record. He claims that his "clean" institutional record for almost thirty years requires the Board to limit his FET to twenty-seven months. We do not agree. Nothing in the superceded code requires the Board to make findings on all three factors.
Trantino clarified the requirement that the Board focus its attention squarely on the likelihood of recidivism. That focus applies to the FET determination as well. Moreover, as the Panel noted, any FET it imposed would be measured from the Board's original decision in May 1993. The Panel noted further that, given appellant's clean infractional record, it is likely that his FET will be reduced over time resulting in a possible release date of 2010. Since appellant is entitled to an annual hearing as a Title 2A offender, the Board may assess his progress and institute a parole hearing should he show significant changes in his response to psychiatric treatment. See Trantino supra, 296 N.J.Super. at 466, 687 A.2d 274. The decision to impose a thirty-year FET is within the Board's discretion and is supported by substantial evidence.

CONCLUSION
We have carefully reviewed the extensive record before us and conclude that the Board was neither arbitrary nor capricious in denying appellant's parole and setting a thirty-year FET. The Board met its obligations under Trantino in (1) following the law, N.J.S.A. 30:4-123.45; N.J.A.C. 10A:71-3.11(b); and N.J.A.C. 10A:71-3.21(d); (2) basing its decision on substantial credible evidence; and (3) applying the relevant legislative policies to the facts. We, therefore, affirm in all respects.
NOTES
[1] N.J.A.C. 10A:71-3.21(d) was amended, effective July 7, 1999, to allow the Board to extend an FET "due to the inmate's lack of satisfactory progress in reducing the likelihood of future criminal behavior." The amendment was intended to give the Board a broader basis for its FET determinations rather than limiting the panel to the consideration of only three factors. The prior code provision was "deemed restrictive and, therefore, inappropriate." 31 N.J.R. 710 (March 15, 1999). Instead, the panel is now permitted "to consider all the factors enumerated in N.J.A.C. 10A:71-3.11." Ibid. The language in the amended code provision mirrors the Trantino holding and is meant to guide the Parole Board in making a decision under the Trantino standard.