**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2252-16T2

IN THE MATTER OF ZANE BATTEN,
DEPARTMENT OF ENVIRONMENTAL
PROTECTON, WINSLOW TOWNSHIP

_____

Argued June 26, 2018 – Decided October 12, 2018

Before Judges Simonelli and Koblitz.

On appeal from the New Jersey Civil Service Commission, Docket No. 2015-3161.

Frank M. Crivelli argued the cause for appellant Zane Batten (Crivelli & Barbati, LLC, attorneys; Frank M. Crivelli, on the brief).

Jennifer L. Moriarty, Deputy Attorney General, argued the cause for respondent Department of Environmental Protection (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Jennifer L. Moriarty, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent Civil Service Commission (Pamela N. Ullman, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

Appellant Zane Batten is a Conservation Officer (CO) employed by the New Jersey Department of Environmental Protection (DEP), Division of Fish and Wildlife (Division), Bureau of Law Enforcement (Bureau). He appeals from the December 22, 2016 final decision of the Civil Service Commission (Commission), which adopted the initial decision of an administrative law judge (ALJ), finding him culpable of conduct unbecoming a public employee and other sufficient cause and imposing a seventy-day suspension without pay. We affirm.

I.

The Bureau is responsible for the enforcement of laws pertaining to fish and wildlife resources and any issues relating to the pollution of the waterways. There are four different regions in the State and each region has COs. COs are sworn law enforcement officers who enforce State and Federal laws enacted to protect and manage fish and wildlife resources. COs do not investigate suspected marijuana cultivation, but sometimes become involved with narcotics enforcement where marijuana growth is suspected within a State Wildlife Management Area.

The Bureau's chain of command is as follows:

1.    a CO III reports to a CO II (Lieutenant);

2.      a CO II reports to a CO I (Captain);

3.      a CO I reports to the Supervising CO (the Deputy Chief);

4.      the Deputy Chief reports to the Chief; and

5.      the Chief reports to the Assistant Director and the Director of the Division.

The Bureau's Standard Operating Procedure (SOP) requires that:

> [a]ll persons in the Bureau . . . shall follow the chain-of-command as established by the organizational chart in all formal or official vertical communications and correspondence that involves activities, statements, questions or any other communications related to their official capacity or duties in the Bureau . . . unless otherwise directed.

During the relevant time period, Batten was assigned as a covert CO II investigator in the Bureau's Special Investigations Unit (SIU).[1] His chain of command was as follows:

> Captain Sean Cianciulli (Batten's immediate supervisor);
>
> Deputy Chief Matthew Brown (commander of the SIU who was responsible for overseeing ongoing operations within the SIU and approving any proposed investigations); and

---

[1] The Bureau formed the SIU to covertly investigate the illegal capture and sale of wildlife and assist uniformed officers in apprehending offenders.

Acting Chief Mark Chicketano (responsible for giving final approval to any investigation Brown approved).

The SOP requires investigators to obtain the approval of the Deputy Chief and Chief to initiate an investigation. The SOP also requires investigators to "periodically inform their supervisor as to the current status of an active cases" and "inform the supervisor any time major activity occurs" and maintain certain documentation of ongoing investigations.

Covert COs are given latitude to make decisions during an ongoing, approved investigation because frequent contact with their chain of command would risk exposing them as law enforcement. Although covert COs may have little face-to-face contact with their supervisor after initiation of an approved undercover investigation, they are still required by the SOP to obtain pre-approval from their chain of command to conduct an investigation. Since Brown and Chicketano were in Batten's chain of command, he had to obtain their approval before initiating an investigation. He also had to periodically inform his supervisor as to the current status of any active case.

In November 2013, Batten allegedly received a tip that someone was growing marijuana in a shed on property adjacent to the State property he patrolled. At that time, he was not assigned to a narcotics investigation or a narcotics task force. He ascertained the person allegedly growing the marijuana

4

was J.G.,[2] with whom he had several encounters over an eighteen-year period and who he believed was an active gang member whose friends were murderers and drug dealers.

Batten referred the matter to the Cumberland County Prosecutor's Office (CCPO) for investigation and handling. The CCPO advised Batten there were no active ongoing investigations of marijuana cultivation. Batten then decided to initiate his own investigation. Without obtaining the approval of or notifying Brown or Chicketano, on November 9, 2013, Batten initiated an investigation of J.G. in an attempt to obtain probable cause to search the shed for marijuana. Batten claimed that in the past, he only talked to his supervisors about an open investigation once he established probable cause and it was not unusual to initiate an investigation without notifying anyone. This was contrary to the SOP.

As part of his plan, Batten placed a phony advertisement on Craigslist in J.G.'s name inviting members of the public to come to J.G.'s property for free scrap metal and listing J.G.'s phone number and the property's address (the phony ad). Batten believed that if people came to the property unannounced,

---

[2] We use initials to protect J.G.'s privacy.

J.G. would become nervous and move the marijuana and Batten would then have probable cause for a search if he observed J.G. moving the marijuana.

The day after he placed the phony ad, Batten hid behind the shed to see if he could smell marijuana or observe J.G. move it. He hid there for eight to ten hours, but observed no suspicious activity. He removed the phony ad, did not pursue the matter further, and did not maintain documentation of the investigation. As a result of the phony ad, J.G. received phone calls and approximately ten to twelve people came to the property looking for scrap metal.

A few days after Batten placed the phony ad, J.G. struck him with a bucket while Batten was investigating a trespass complaint on property he patrolled. Batten signed an arrest warrant for J.G., and J.G. was arrested and charged with assault. The charge was ultimately dismissed. While investigating Batten's assault allegations, J.G.'s attorney discovered that Batten had placed the phony ad.

J.G. filed an internal affairs (IA) complaint against Batten with the CCPO, alleging harassment. Cianciulli accompanied Batten to an interview with the CCPO, during which Batten admitted that he placed the phony ad and why he did so. The CCPO referred the matter to the Bureau to be handled by the DEP.

Brown and Chicketano went to the DEP's Division of Human Resources (HR), Office of Labor Relations (OLR) regarding J.G.'s complaint. Among its rsponsibilities, the OLR is authorized to review the Bureau's requests for discipline and determine the appropriate charges and penalty. According to Chicketano, it was typical for the OLR to be involved from the inception of an IA investigation.

The Bureau's SOP requires investigators of IA complaints to "interview the complainant, all witnesses and the subject officer as well as review relevant reports and records, and obtain other relevant information and materials," complete a report summarizing the matter, and provide recommended dispositions, including exonerated, sustained, not sustained or unfounded. The investigation report is then sent to the Chief, who reviews the documentation, directs whatever action is deemed appropriate, and notifies the officer of the disposition.

If the complaint is sustained and it is determined that formal charges should be brought, the matter is directed to the OLR for further action. The OLR must prepare a formal notice of charges and hearing. DEP's Policy and Procedures (the Policy) requires that all employees "cooperate with OLR and provide information requested." Under the Policy, the OLR is responsible for

7

reviewing pertinent documents provided by program supervisors and may conduct additional investigations and issue appropriate disciplinary action, both charges and penalty, as warranted.

An investigator interviewed J.G. and summarized the interview in a report. After the interview, Rina Heading from the OLR contacted Batten and his union representatives about scheduling Batten's interview. She advised them that the investigation could lead to discipline and it was Batten's responsibility to contact his union representatives if he wanted union representation at the interview.

Batten met with Heading, Chicketano and Brown without a union representative. He admitted he posted the phony ad and conducted surveillance of J.G.'s property. Heading requested that Batten submit a written statement. The DEP claims he refused to provide a written statement. Batten and Chicketano raised a concern about whether a written statement would be subject to disclosure under the Open Public Records Act (OPRA). Batten testified before the ALJ that he was concerned for his safety if J.G. filed an OPRA request and discovered he had posted the phony ad because J.G. and his associates were involved in violent crimes. While he was allegedly concerned for his own safety, he testified he was not concerned about the individuals who might have

shown up at the property in response to the phony ad. Batten also maintained that the investigation was "ongoing" because of "the knowledge [he had] about the marijuana that subsequently can be . . . investigated the next year." However, there was no approved ongoing investigation.

The OLR advised Batten's union of the meeting with Batten and advised that the OLR had to meet with Batten again to obtain a written statement. Batten attended a second meeting with three union representatives and refused to provide a written statement.

Brown sent a confidential memorandum to Chicketano summarizing the IA investigation. Brown determined the allegations against Batten regarding the phony ad were substantiated and recommended the IA complaint be sustained. As required by the SOP, the IA complaint was directed to the OLR for further action.

The matter was brought to the attention of HR Director Robin Liebeskind, who advised DEP management and provided documentation, including J.G.'s IA complaint and Brown's confidential memorandum. Liebeskind and DEP management considered the severity of the offense and potential danger to the public caused by Batten's actions and Batten's employment record, and determined a seventy working day suspension was an appropriate penalty.

9

The DEP served Batten with a preliminary notice of disciplinary action, charging him with conduct unbecoming a public employee, N.J.A.C. 4A:2-2.2(a)(6), for initiating an investigation without notice to or approval from his chain in command in violation of the SOP, and for potentially endangering the public. The DEP also charged Batten with other sufficient cause, N.J.A.C. 4A:2-2.3(a)(12), for refusing to provide a written statement in violation of the Policy. The DEP sought to suspend Batten for seventy working days.

The charges and penalty were sustained following a departmental hearing. The DEP then served Batten with a final notice of disciplinary action and suspended him for seventy working days without pay. Batten appealed to the Commission, which transferred the matter to the Office of Administrative Law for a hearing as a contested case.

Brown, Liebeskind, and OLR Administrator Jason Strapp testified for the DEP. Strapp testified the OLR is "the only [d]epartment within the DEP that has the ability to discipline[.]"

Batten and Chicketano testified on Batten's behalf. Chicketano agreed the SOP provides that the OLR is responsible for bringing formal disciplinary charges and conducting a hearing. He testified he asked the OLR to verify that a written statement by Batten would not be subject to OPRA and explained that

if the OLR determined the statement would be subject to OPRA, it would be Batten's decision whether to give a written statement or not. He testified that Strapp reassured him no further action would be taken until such determination was made. Ultimately, he never learned whether the statement would be subject to OPRA.

Chicketano also testified that during an IA investigation, he normally made recommendations to the OLR regarding discipline; however, he made no recommendation to the OLR as to what penalty Batten should receive. He recommended to Brown and Cianciulli that Batten receive a formal letter of reprimand, but no suspension. Notably, Chicketano testified he would not have approved Batten's investigation of J.G. or his plan to place the phony ad enticing individuals to go to J.G.'s property in light of J.G.'s alleged criminal affiliations that could endanger the public.

In her initial decision, the ALJ found Batten was not credible. The ALJ rejected Batten's testimony that he was given wide discretion to do what he wanted and needed no authorization to initiate and conduct investigations. The ALJ found that Batten's "failure to report the investigation, even after the fact, [was] further evidence that he knew such conduct was not permitted." The ALJ further found that Batten had "ongoing issues with [J.G.], which may have been

why he failed to obtain the necessary authorization to investigate and conduct surveillance on [J.G.]"   The ALJ also rejected Batten's testimony about why he feared submitting a written statement.  The ALJ found Batten knew that J.G. had discovered Batten placed the phony ad, and Batten had arrested J.G. in the past and filed assault charges against him.

The ALJ concluded that the DEP proved by a preponderance of the evidence that: (1) Batten violated the SOP requiring him to obtain authorization to conduct an investigation, constituting conduct unbecoming a public employee; and (2) Batten violated the Policy by refusing to give a written statement to the OLR.  In affirming the seventy working day suspension, the ALJ found that despite having no prior disciplinary record, "initiating an investigation such as this without any authorization [was] egregious enough to merit a severe penalty" and Batten's "failure to provide a written report after conceding to the conduct [was] a clear violation of the [Policy], as well as insubordination."

In his exceptions filed with the Commission, Batten argued that the ALJ: (1) improperly questioned and cross-examined witnesses; (2) failed to address Chicketano's testimony, which corroborated Batten's testimony that he did not refuse to provide a written statement; and (3) failed to consider that the OLR

exceeded its disciplinary role because Chicketano had already disciplined and verbally counseled Batten. Batten also argued his suspension was not consistent with progressive discipline.

The Commission rejected Batten's exceptions and accepted and adopted the ALJ's initial decision in its entirety, including her credibility determinations. Regarding Batten's claim that the ALJ improperly questioned and cross-examined witnesses, the Commission concluded:

> the ALJ amply supported her determination that [Batten] was not credible. . . . Additionally, there is no substantive evidence to show that the ALJ's actions of questioning [Batten] and the witnesses prevented [the ALJ] from acting as a neutral and independent fact finder during the hearing, or that such behavior somehow adversely affected the case. Indeed, N.J.A.C. 1:1-14.6(o) permits an ALJ to require any party at any time to clarify confusion or gaps in the proofs and an ALJ may question any witness to further develop the record. [Batten] has not set forth anything in his appeal which convinces the Commission that the ALJ's questioning of the witnesses was unreasonable or her credibility determinations were unreasonable or not based on the evidence in the record.

In accepting and adopting the penalty, the Commission stated it was

> not swayed by [Batten's] attempts to minimize the situation by claiming that he was trained in various investigatory techniques and that his job expectations allowed him to independently conduct investigations. [Batten] is an experienced [CO] and he should have known that he was required to obtain authorization

13

before conducting an investigation. Without obtaining permission to conduct an investigation, [Batten's] actions were highly inappropriate, especially since he had previous dealings with the alleged suspect. The fact that [Batten] had prior involvement with the alleged suspect, was afraid the evidence would be moved, and his alleged reliance on Chicketano's instructions, does not mitigate the egregious nature of his actions. . . . In fact, since he admittedly has nearly [twenty] years of experience in performing such duties, [Batten] should have known that he was not supposed to have engaged in such inappropriate behavior.

The Commission considered Batten's personnel record and lengthy employment as a CO without any prior major discipline, and concluded:

[Batten's] offenses of inappropriately conducting an investigation without authorization, failing to notify his supervisors of the investigation, placing a fake advertisement on Craigslist, and failing to submit a report of the incident, is sufficiently egregious to warrant a [seventy] working day suspension. Accordingly, the Commission concludes that the penalty imposed by the [DEP] is neither unduly harsh nor disproportionate to the offense and there is sufficient basis to uphold [Batten's] [seventy working day suspension.

The Commission also rejected Batten's contention that he could not receive this penalty because Chicketano had disciplined him. The Commission concluded, "[i]n order to be considered actual discipline, a penalty of at least a formal written reprimand is required, as that is the lowest form of formal

14

discipline contemplated under Civil Service law and rules. See N.J.A.C. 4A:2-2.2 and N.J.A.C. 4A:2-3.1."

On appeal, Batten reiterates the arguments made to the ALJ and Commission. He also adds that the Commission erred in accepting and adopting the ALJ's initial decision.

Our scope of review of an administrative agency's final determination is limited. In re Stallworth, 208 N.J. 182, 194 (2011). "[A] 'strong presumption of reasonableness attaches to [an agency decision].'" In re Carroll, 339 N.J. Super. 429, 437 (App. Div. 2001) (quoting In re Vey, 272 N.J. Super. 199, 205 (App. Div. 1993)). "In order to reverse an agency's judgment, [we] must find the agency's decision to be 'arbitrary, capricious, or unreasonable, or [] not supported by substantial credible evidence in the record as a whole.'" Stallworth, 208 N.J. at 194 (second alteration in original) (quoting Henry v. Rahway State Prison, 81 N.J. 571, 579-80 (1980)). As our Supreme Court has instructed:

> In determining whether agency action is arbitrary, capricious, or unreasonable, [we] must examine:
>
> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying

the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

[Ibid. (quoting In re Carter, 191 N.J. 474, 482-83 (2007)).]

We "may not substitute [our] own judgment for the agency's, even though [we] might have reached a different result." Ibid. (quoting Carter, 191 N.J. at 483). "This is particularly true when the issue under review is directed to the agency's special 'expertise and superior knowledge of a particular field.'" Id. at 195 (quoting In re Hermann, 192 N.J. 19, 28 (2007)). "Nevertheless, 'we are not bound by the agency's legal opinions.'" A.B. v. Div. of Med. Assistance & Health Servs., 407 N.J. Super. 330, 340 (App. Div. 2009) (quoting Levine v. State, Dep't of Transp., 338 N.J. Super. 28, 32 (App. Div. 2001)). The burden of proving that an agency action is arbitrary, capricious, or unreasonable is on the challenger. Bueno v. Bd. of Trs., 422 N.J. Super. 227, 234 (App. Div. 2011) (citing McGowan v. N.J. State Parole Bd., 347 N.J. Super. 544, 563 (App. Div. 2002)).

We have considered Batten's arguments in light of the record and applicable legal principles and conclude they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). We affirm substantially for the reasons the Commission expressed in its final agency

16

decision. We are satisfied there is sufficient credible evidence in the record as a whole supporting the Commission's decision, R. 2:11-3(e)(1)(D), and the decision is not arbitrary, capricious, or unreasonable.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2252-16T2