**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0036-22

IN THE MATTER OF
ALTON PORTER,
NORTHERN STATE
PRISON, DEPARTMENT
OF CORRECTIONS.

_____

Submitted April 16, 2024 – Decided May 3, 2024

Before Judges Puglisi and Bergman.

On appeal from the New Jersey Civil Service Commission, Docket No. 2022-1964.

The Law Offices of Fusco & Macaluso, attorneys for appellant Alton Porter (Alexandra Elizabeth Macaluso, on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent Northern State Prison, Department of Corrections (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Andrew J. Sarrol, Deputy Attorney General, on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent New Jersey Civil Service Commission (Brian D. Ragunan, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

Alton Porter appeals from the Civil Service Commission's (Commission) adoption of the findings and sanctions imposed by an Administrative Law Judge (ALJ) which upheld the charges and removal sanction against him as set forth in a Final Notice of Disciplinary Action.

We affirm.

I.

On December 8, 2021, Northern State Prison (NSP) served Porter, a Senior Correctional Police Officer (SCPO), with a Preliminary Notice of Disciplinary Action. Porter waived a departmental hearing and on February 16, 2022, NSP served him with a Final Notice of Disciplinary Action. The Final Notice found violations of N.J.A.C. 4A:2-2.3(a)(6), conduct unbecoming a public employee; N.J.S.A. 4A:2-2.3(a)(12), other sufficient cause; and the following Department of Corrections disciplinary offenses: violation of administrative procedures and/or regulations involving safety and security; violation of a rule, regulation, policy, procedure, order, or administrative decision; inappropriate physical contact or mistreatment of an inmate; falsification, intentional misstatement of material fact in connection with work;

conduct unbecoming an employee; and negligence in performing duty resulting in injury to persons or damage to property. The sanction imposed was removal.

Porter requested a hearing and filed simultaneous appeals to the Commission and the Office of Administrative Law (OAL). An ALJ conducted the hearing on April 22, 2022, and May 31, 2022. On June 22, 2022, the ALJ issued a written initial decision, upholding the violations found against Porter and, in addition, upheld the removal sanction imposed.

The ALJ's decision was filed with the Commission and served on the parties. Porter filed exceptions and NSP filed a reply. On August 3, 2022, the Commission adopted the ALJ's findings of fact and conclusions of law in full. The Commission found Porter's exceptions "unpersuasive and mostly unworthy of comment as the ALJ's findings and conclusions in upholding the charges . . . [were] not arbitrary, capricious or unreasonable." The Commission gave due deference to the ALJ "who has the benefit of hearing and seeing the witnesses, is generally in a better position to determine the credibility and veracity of the witnesses" and upheld Porter's removal.

The factual history relevant to the violations and sanctions imposed in this appeal were developed at the OAL hearing which follow herein.

3

As an SCPO at NSP, Porter was considered a General Assignment Officer. This entailed having a set shift routine for four days of the week and being assigned to a different post based on the prison's needs, which, for him, required post assignments on Thursdays. According to the policies and procedures set for General Assignment Officers, Porter was required to be familiar with the internal management procedures relevant to any post he was assigned. Further, Porter was personally responsible for ensuring the "safety and protection of inmates" wherever he was assigned.

On Thursday, September 19, 2019, Porter was posted to Delta Unit Yard after completing several assigned tasks in the main compound. At NSP, channel one on the radio is used for the main compound and channel three is used for the Delta Unit. Inmates housed in Delta Unit included those inmates who have committed crimes while incarcerated. During "yard time," the procedure includes officers patting down inmates, putting them in secured recreation areas which are referred to as "cages" and monitoring the yard time from a booth with a window which faces the yard. A video camera with audio recording capabilities is operated by the officers in the booth to record the activities of the recreating inmates. Porter was posted to the Delta Unit Yard with Officer Brendan Whitford.

A-0036-22

Prior to taking his post, Sergeant Armour, Porter's supervisor, warned Porter to watch for a potential fight because a dispute arose concerning an inmate allegedly owing another inmate some money. Officer Whitford was informed of this information by Sergeant Armour and Porter. At the OAL hearing, Terry Walker, an inmate, testified that he warned Porter that his cell mate, Keven Vallejo, was going to be "jumped" because he identified as gay and asked Porter to protect Vallejo from being "jumped." Further, Walker testified that Porter said he would move the camera. Porter split the group of thirteen inmates into six and seven and separated them into two cages. Part of the group of six as determined by Porter included inmates Terry Walker, Kevin Vallejo, Omar Greene and Altariq Gumbs.

When Porter and Officer Whitford were in the observation booth, Porter was heard on the video recording saying, "I put them in the cage so they can fight, and it better be a good fight." A few minutes later, the video shows Greene, with both hands wrapped in a white material, squaring up to fight with Vallejo. A few seconds later, Porter can be heard saying, "I should tell someone about this," however Porter is not heard calling in a "Code 33" emergency until a minute after the inmates "square[d] up" and thirty seconds after the first punch was thrown. The camera was moved after the fight started and the fight was not

A-0036-22

recorded for about thirty seconds. By the time the camera was back in position to record the fight, Gumbs had joined Greene in the assault of Vallejo.

When other officers responded to the Code 33, Greene and Gumbs were beating Vallejo, who was on the ground. The inmates responded to verbal stop commands and the situation was resolved without the use of force. Greene, Gumbs and Vallejo were taken to the infirmary and Vallejo was treated for multiple lacerations of his mouth; contusions to his head; loss of consciousness; and boot marks on his chest and back. Greene admitted to assaulting Vallejo because of his sexual orientation and Gumbs admitted to assisting Greene with the assault.

Porter testified that he radioed in a Code 33 on channel one by accident while he was outside of the booth determining which inmates were fighting and he only realized his mistake after no other officers arrived within the response time of thirty seconds. Further, Porter claimed that the radio call could not be heard on the tape, as he was outside of the booth. Porter first mentioned these facts at the OAL hearing, but the investigation records indicated that he had failed to mention this during the investigation. Also, Porter testified at the OAL hearing that he had switched to channel three after arriving in Delta Unit and

6

radioed to another officer on channel three that he was in position ten to fifteen minutes before the assault occurred.

After the incident, NSP's Special Investigations Division conducted an investigation concerning the assault. In approximately one month thereafter, investigators conducted video recorded interviews with the inmates involved in the fight, occurring after their disciplinary hearings were concluded. At that time, Walker was the only inmate unwilling to provide a statement. A year later, investigators re-interviewed those involved in the fight, except Greene. Gumbs and Vallejo had been released in the intervening year, and Gumbs was on parole for a juvenile charge. Walker was willing to provide a statement during this second round of interviews. In his interview, Walker claimed Porter told him to wait until he moved the camera to fight. In his second interview Gumbs stated that Porter gave the "green light to get right" and that they had thirty seconds to fight. Greene stated in his interview that Walker had instigated the altercation and talked to Porter who, in the conversation, instructed Walker he had two minutes to fight.

Over the next year, investigators interviewed several staff members, including Porter and Sergeant Armour. Although investigators attempted to interview Officer Whitford, he refused to provide a statement and only testified

7                                                                 A-0036-22

in front of a grand jury concerning the incident. Officer Whitford resigned in good standing on September 24, 2021. More than two years after the incident occurred, the Administrative Investigation Supplemental Report was submitted to NSP administration for "any action deemed appropriate". The report concluded that Porter had knowledge of a potential physical altercation beforehand, and while Porter acknowledged his statements only after being confronted with the video, he denied orchestrating the altercation or discussing it with inmates prior to it occurring.

In her findings, the ALJ made credibility determinations based on the conflicting testimony of the witnesses. She found that Walker and Whitford were credible witnesses, while Porter was less credible due to the contradictory nature of his testimony. The ALJ also found that Porter had prior knowledge of a fight and his delay in calling a Code 33 was purposeful and supported sustaining the charges of conduct unbecoming a public employee, inappropriate physical contact or mistreatment of an inmate, other sufficient cause, and negligence in performing duty resulting in injury. Further, the ALJ found Porter's testimony to be inconsistent and less credible because, as part of the investigation, Porter represented he was not informed there could be a fight, but later testified that Armour and Walker told him about a potential fight and he

8

and Whitford talked about the fight prior to it starting. The ALJ found that this conduct sustained the charge of falsification, or intentional misstatement of material fact in connection with work.

Overall, the ALJ found that Porter's removal was warranted due to the "catastrophic consequences" that a delay in calling a Code 33 could cause and the fact that Vallejo suffered serious injuries that could have been prevented.

After exceptions to the ALJ's findings were filed and argued, the Commission adopted the ALJ's findings and conclusions.

II.

Established precedents guide our task on appeal. Appellate review of an administrative agency decision is limited. In re Herrmann, 192 N.J. 19, 27 (2007). A strong presumption of reasonableness attaches to the Commission's decision. In re Carroll, 339 N.J. Super. 429, 437 (App. Div. 2001). A party appealing an ALJ decision has the burden to demonstrate grounds for reversal. McGowan v. N.J. State Parole Bd., 347 N.J. Super. 544, 563 (App. Div. 2002); see also Bowden v. Bayside State Prison, 268 N.J. Super. 301, 304 (App. Div. 1993) (holding that "[t]he burden of showing the agency's action was arbitrary, unreasonable or capricious rests upon the appellant").

A-0036-22

Appellate courts generally defer to final agency actions, only "reversing those actions if they are 'arbitrary, capricious or unreasonable or [if the action] is not supported by substantial credible evidence in the record as a whole.'" N.J. Soc'y for the Prev. of Cruelty to Animals v. N.J. Dep't of Agric., 196 N.J. 366, 384-85 (2008) (alteration in the original) (quoting Henry v. Rahway State Prison, 81 N.J. 571, 579-80 (1980)).

Under the arbitrary, capricious, and unreasonable standard, our scope of review is guided by three major inquiries: (1) whether the agency's decision conforms with relevant law; (2) whether the decision is supported by substantial credible evidence in the record; and (3) whether in applying the law to the facts, the administrative agency clearly erred in reaching its conclusion. In re Stallworth, 208 N.J. 182, 194 (2011).

When an agency decision satisfies such criteria, we accord substantial deference to the agency's fact-finding and legal conclusions, acknowledging the agency's "'expertise and superior knowledge of a particular field.'" Circus Liquors, Inc. v. Middletown Twp., 199 N.J. 1, 10 (2009) (quoting Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992)). We will not substitute our judgment for the agency's even though we might have reached a different conclusion. Stallworth, 208 N.J. at 194; see also In re Taylor, 158 N.J. 644, 656

(1999) (discussing the narrow appellate standard of review for administrative matters).

We "must . . . give due regard to the opportunity of the one who heard the witnesses to judge their credibility." Logan v. Bd. of Review, 299 N.J. Super. 346, 348 (App. Div. 1997) (citation omitted). [I]t is not for us….to disturb th[e] credibility determination[s], made after due consideration of a witnesses' testimony and demeanor during [an administrative] hearing. H.K. v. State, 184 N.J. 367, 384 (2005). For these reasons, "[i]f the factual findings of an administrative agency are supported by sufficient credible evidence, [we] are obliged to accept them." Self v. Bd. of Review, 91 N.J. 453, 459 (1982) (citation omitted).

Our deference to agency decisions "applies to the review of disciplinary sanctions as well." Herrmann, supra, 192 N.J. at 28. "In light of the deference owed to such determinations, when reviewing administrative sanctions, the test . . . is whether such punishment is so disproportionate to the offense, in light of all the circumstances, as to be shocking to one's sense of fairness." Id. at 28-29 (internal quotation marks omitted). "The threshold of 'shocking' the court's sense of fairness is a difficult one, not met whenever the court would have reached a different result." Id. at 29.

Our Supreme Court has discussed the concept of "progressive discipline" in a board's imposition of penalties. See In re Carter, 191 N.J. 474, 483-84 (2007) (discussing the theory of "progressive discipline"). However, a significant penalty may be appropriate, even where a corrections officer does not have a prior disciplinary record if the misconduct in question is sufficiently serious. See Henry, 81 N.J. at 580; see also Herrmann, 192 N.J. at 33 ("[P]rogressive discipline has been bypassed when an employee engages in severe misconduct, especially when the employee's position involves public safety and the misconduct causes risk of harm to persons or property."); Carter, 191 N.J. at 486 (noting some offenses are so severe that dismissal may be appropriate even where an employee has no prior record of discipline).

### III.

Turning to the ALJ's factual findings and the imposition of the removal sanction, which were accepted by the Commission, we conclude sufficient, credible evidence existed in the record to support the ALJ's findings Porter violated the disciplinary rules and standards as charged and the evidence was sufficient to sustain the sanction of removal levied upon Porter. In addition, we further conclude the ALJ's findings sustaining the violations and the removal

12

sanction imposed against Porter were not arbitrary, capricious or unreasonable and are entitled to our deference.

The findings by the ALJ adopted by the Commission were supported by sufficient and credible evidence garnered at the hearing. Her determinations were not so wide of the mark to be arbitrary, unreasonable or against the weight of the evidence. The hearing record supports the ALJ's findings that Porter was not as credible as the other witnesses, which included two prison employees, and based on multiple inconsistencies in his testimony as compared to his statements made as part of the investigation. Upon review of these findings by the ALJ, we conclude her evidence weighing and credibility determinations are supported by sufficient and credible evidence and are entitled to our deference.

Similarly, we determine the removal sanction imposed on Porter is also entitled to our deference since the factual determinations supporting the finding of violations against Porter concerned the physical safety of inmates and because Porter was found to be part of a plan or conspiracy which enabled a violent physical assault on an inmate. When considering the factual circumstances surrounding this assault, we determine the removal sanction was not so disproportionate to the offenses which would shock one's sense of fairness.

In addition, the failure to provide a lesser sanction than removal based on

13

progressive discipline policies is not supported by the record because the violative acts found against Porter easily fit into the category of severe misconduct. In addition, since his position involved the safety of inmates and his misconduct was a contributing factor which caused substantial harm to inmate Vallejo, the offenses found against Porter support the sanction imposed.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0036-22